**William J. BARRETT, Edwin W. Elder, Martin L. Solomon, and Wilmer J. Thomas, Jr., Plaintiffs,**

v.

**AMERICAN COUNTRY HOLDINGS, INC., a Delaware corporation, Defendant.**

**C.A. No. 3071–VCS.**

Court of Chancery of Delaware.

Submitted: May 14, 2008.
Decided: June 20, 2008.

---

Matthew E. Fischer, Esquire, Kirsten A. Zeberkiewicz, Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE; Lewis J. Liman, Esquire, Michele Kenney, Esquire, Cleary Gottlieb Steen & Hamilton, LLP, New York City, for Plaintiffs.

Kevin F. Brady, Esquire, Jeremy D. Anderson, Esquire, Connolly Bove Lodge & Hutz, LLP, Wilmington, DE; Harold J. Ruvoldt, Jr., Esquire, Cathy Fleming, Esquire, Nixon Peabody, LLP, New York City, for Defendant.

## OPINION

STRINE, Vice Chancellor.

A corporation has accused its former directors of engaging in intentional fraud in their official capacities. The former directors have a clear right to have their fees advanced to defend themselves against those charges. To date, however, a directors and officers' ("D & O") insurance policy has covered their fees, but the former directors brought this suit because the policy limits were nearly exhausted.

The corporation has refused to acknowledge the former directors' right to advancement despite the clear terms of the certificate of incorporation of the corporation they served as directors. It has done so because the former directors refused to accept settlement proposals in the underlying securities litigation, each of which required the entry of a judgment in favor of the corporation in that suit and the assignment of any rights the former directors have against the D & O insurer. Because the corporation has offered not to collect on the judgment, the corporation argues that the former directors have forfeited their right to advancement by unreasonably refusing settlement. The corporation makes this outlandish argument even while admitting that the former directors have received millions of dollars in advanced fees from the D & O insurer under a reservation of rights, and that the policy requires them to obtain approval from the D & O insurer before settling. That approval has not been forthcoming, in large measure because the corporation wishes to extract the judgment from the former directors and wield it as a club against the D & O insurer in a bad faith action it has

pending against the insurer. Thus, the corporation says that even though the former directors must breach their contract with the D & O insurer to agree to the settlements it has proposed, the former directors' failure to do so has rendered them ineligible to receive the contractual advancement benefits due them.

The corporation's position is remarkable, but in a regrettable way. Its stockholders will now endure not only the cost of honoring the corporation's promise to the former directors, but also the costs needlessly run up by the corporation because it chose to assert a baseless and illogical defense that wasted the resources of the former directors, this court, and the corporation itself.

If a corporation sues its former directors for intentional fraud in their official capacity and owes those directors advancement rights, it has no right to require them to accept a judgment against themselves of any kind, much less to say that the officials whose reputations and wealth the corporation has put at risk lose their advancement rights by failing to agree to such a demand. The very purpose of an advancement right is to enable a corporate official to protect herself against claims of official wrongdoing. If the corporation here wishes to drop its suit, it is free to do so. But it has no right to breach its obligation to those it has sued on the pretense that the former directors will not agree to the entry of an adverse judgment in a securities case. The former directors have every right to defend the case and to seek a complete vindication, one which will minimize the reputational consequences they have already suffered as a result of the corporation's charges of intentional fraud.

Equally obvious is that the former directors do not have to engage in behavior that will breach their obligations under the D & O policy. Although the corporation

raises all sorts of arguments as to why the former directors face no material risk of liability to the insurer, those arguments are self-serving, weak in material respects, and, most important, irrelevant. The former directors have no duty to take legally problematic action simply because the corporation that has sued them wants them to do so. Again, if the corporation wishes to drop its suit against the former directors, it is free to do so. What it is not free to do is to condition the former directors' advancement rights on their willingness to suffer a judgment and put themselves in the midst of a struggle between the corporation and their D & O insurer.

A judgment and order shall be entered for the former directors and all of their fees and expenses in this case shall be paid by the corporation.

## I.  *Factual Background*

Before 2002, Kingsway Financial Services, Inc. ("Kingsway") and American Country Holdings, Inc. ("American Country") were both publicly traded insurance holding companies that conducted business as property and casualty insurers through their respective subsidiaries. On April 5, 2002, Kingsway completed a tender offer for American Country shares that eventually resulted in American Country becoming a wholly-owned subsidiary of Kingsway. The plaintiffs in this action, William J. Barrett, Edwin W. Elder, Martin L. Solomon, and Wilmer J. Thomas, Jr., (collectively, the "Former Directors") were directors of American Country at the time of that acquisition.

On July 25, 2003, Kingsway, American Country, and several other Kingsway subsidiaries filed a lawsuit in the U.S. District Court for the Southern District of New York (the "Fraud Action") stemming from Kingsway's acquisition of American Country. Because Kingsway now controls

American Country and its other subsidiaries, those corporations have taken similar positions in the Fraud Action, and Kingsway appears to have directed settlement negotiations for that Action, I will generally refer to all the plaintiffs in the Fraud Action and the defendant in this case as simply Kingsway.

In the Fraud Action, Kingsway makes claims against the Former Directors; John Dore, American Country's former chief executive officer; Karla Violetto, American Country's former chief financial officer; and PricewaterhouseCoopers, American Country's independent auditor. In particular, Kingsway argues that it was misled about American Country's financial health before its acquisition of American Country because the Former Directors and other defendants in the Fraud Action made intentionally inaccurate and misleading disclosures that understated American Country's reserves. The complaint in the Fraud Action charges the Former Directors with conduct that Kingsway's counsel acknowledges would be criminal if proven.[1]

Because the claims in the Fraud Action were made against the Former Directors in their roles as directors of American Country, the legal fees incurred by the Former Directors in connection with that proceeding have been paid by Great American Insurance Company ("Great American") under a $10 million insurance policy covering American Country's former directors and officers (the "D & O Policy"). Dore and Violetto, as American Country's former officers, are also covered by the D & O Policy. Great American has advanced fees to the Former Directors under a res-

ervation of the right to demand repayment if it is later determined that the claims in the Fraud Action were not covered by the D & O Policy. That reservation is important because if the Former Directors are later found liable for intentional fraud, their conduct would likely be deemed to be both "deliberately fraudulent [and] criminal," behavior that is explicitly excluded from coverage under the D & O Policy.[2] In the event of such a finding, the Former Directors would not be entitled to coverage under the D & O Policy for any judgment against them and could be required by the insurer to repay the fees and costs previously advanced to them in the Fraud Action.[3]

Early on in the Fraud Action, Kingsway seems to have focused on a strategy that centered more on extracting as much of the cash value of the D & O Policy as it could than on proving its claims against the defendants and collecting a judgment entered against them. That is, Kingsway sought to monetize the D & O Policy by getting Great American to agree to settlements whereby it would pay over a substantial portion of the Policy limits in exchange for a settlement releasing some number of the individual defendants, who were insureds under the D & O Policy. To that end, on August 23, 2004, Kingsway offered to drop all of its claims against the Former Directors, Dore, and Violetto and give them a complete release in return for an $8.5 million payment from Great American.[4] That sum, together with the attorneys' fees Great American had already paid, would have pushed the total expenses paid under the D & O Policy to within $1 million of the Policy limits. Any settle-

---

1. Trial Transcript ("Tr.") at 193.

2. JX·2 ("D & O Policy") § 4(a)(2).

3. *Id.* §§ 4(a)(2), 7(e)(4).

4. JX 84. That settlement would have allowed Kingsway to continue its suit against another deep pocket, American Country's independent auditor, PricewaterhouseCoopers.

ment by the defendants in the Fraud Action was subject to approval by Great American under the terms of the D & O Policy, which states the following:

> The Insured shall not incur Costs of Defense, or admit liability, offer to settle, or agree to any settlement in connection with any Claim *without the express prior written consent of the Insurer*, which consent shall not be unreasonably withheld.... Any Loss resulting from any admission of liability, agreement to settle, or Costs of Defense incurred prior to the Insurer's consent shall not be covered hereunder.[5]

In this particular case, Great American was being asked to pay over almost the entire Policy and it refused. Instead, Great American made a counteroffer to pay Kingsway $500,000. Kingsway rejected that offer.

With the parties unable to reach a settlement, the Fraud Action proceeded for the next several years and the D & O Policy was materially drawn down by defense costs. In July of 2007, under $5 million of coverage remained on the D & O Policy and the parties were about to begin an expensive round of depositions. Therefore, it was increasingly likely that the D & O Policy would be expended before the conclusion of the Fraud Action. Sensing that, the Former Directors brought this action on July 5, 2007, seeking a declaratory judgment that they were owed advancement for their defense of the Fraud Action, so that they would receive seamless coverage once the Policy limits were exhausted. Article Eighth of American Country's charter required that American Country advance legal expenses to former

officers and directors "to the fullest extent permitted by ... Section 145" of the DGCL.[6] The Former Directors wrote to Kingsway to confirm their entitlement to advancement on November 6, 2003, April 12, 2004, and June 5, 2007, but never received a positive response.

Kingsway was unhappy that the D & O Policy limits that it had hoped to secure as a recovery in the Fraud Action were going to be used solely to provide a defense for the defendants Kingsway had accused of fraud. Kingsway therefore began to develop an unusual plan to hold Great American responsible to it for damages. This involved arguing that Great American had acted in bad faith by refusing the August 2004 settlement proposal that had demanded $8.5 million. Kingsway did not raise this argument until November 15, 2007, as a counterclaim in an interpleader lawsuit that I will soon describe, but began laying the groundwork for that claim as early as July 2007. As it would later argue, Kingsway's theory was that Great American "allowed the limits of the [D & O] Policy to erode ... to the point ... that the [remaining] sum [was] not sufficient to settle all the claims against the [Former Directors, Violetto, and Dore]."[7]

On July 9, 2007, Kingsway made a settlement proposal for remainder of the D & O Policy. Under its terms, the Former Directors and Violetto would have been dismissed as defendants in the Fraud Action and received releases. But the settlement proposal had a couple of hitches. Defendant Dore, American Country's former CEO, was not included and he would have still faced suit from Kingsway. But Dore was also an insured under the D & O Policy, which by the terms of the settle-

---

5.  D & O Policy § 7(a) (emphasis added).

6.  JX 1, art. Eighth (emphasis added); 8 Del. C. § 145.

7.  JX 34 ¶ 50.

ment would have been exhausted and unable to provide defense costs to him.[8] The settlement proposal also required the Former Directors to agree "to appear voluntarily when requested by [Kingsway] to provide truthful testimony in any proceedings" and that they assign to Kingsway any claims that they had "against any and all third parties [including Great American] related to th[e Fraud Action] or the business of American Country or Kingsway."[9] These terms were clearly designed to set up the planned bad faith claims against Great American. As discussed, the Former Directors could not agree to this settlement under the D & O Policy without Great American's "express prior written consent."[10] The July 9 proposal expired by its own terms at 5 p.m. the next business day. The Former Directors asked Kingsway to give Great American additional time to consider the proposal, which Great American had requested. Even though the Kingsway offer required Great American to address important conflicts among its insureds and, if accepted, could give rise to further disputes, Kingsway refused to give Great American more time and its offer expired.

Realizing that it was being targeted by Kingsway, Great American responded by filing an interpleader complaint in the U.S. District Court for the Southern District of New York against Dore, Violetto, and the Former Directors on July 18, 2007 (the "Interpleader Action"). In the Interpleader Action, Great American attempted to turn over the remainder of the D & O Policy to the court "to resolve multiple and competing demands to the remaining proceeds of the Policy by the Interpleader-Defendants, which may expose Great American to liability."[11]

Around this time, Kingsway began to obsess over the idea of having the Former Directors agree to a judgment against themselves in the Fraud Action as a method of achieving a monetary recovery from Great American. The basic concept Kingsway came up with was that the Former Directors would stipulate to the entry of an adverse judgment for a particular dollar amount and assign any claims that they had against Great American to Kingsway. As counsel for Kingsway, Mr. Ruvoldt—who came up with this oddment—stated at trial, he believed that Kingsway needed to show that the Former Directors had suffered a "detriment" in order for Kingsway to be able to pursue the Former Directors' bad faith claims that would be assigned to it.[12] To be as concrete as one

---

**8.** At that time, Dore had been receiving advancement of legal fees from a separate agreement with American Country. The continuation of American Country's advancement of fees to Dore was not assured, however. Kingsway had attempted to terminate Dore's advancement rights using arguments it admits are nearly identical to those it has raised in this proceeding. Kingsway Pre-Trial Op. Br. at 18 ("[American Country] moved to vacate [an] advancement order in the Illinois case, *Dore v. American Country Holdings, Inc. et al.,* Case No. 03 CH 8189, Hon. Peter J. Flynn, Cook County Circuit Court, County Department, Chancery Division, on the same grounds and on the same essential terms of settlement as here—that it was unreasonable for Dore to reject settlement proposals which did not implicate his personal assets. On February 15, 2008 Judge Flynn denied [American Country's] motion to vacate the advancement order (Order dated March 14, 2008).").

**9.** JX 48 ¶¶ 3, 6.

**10.** D & O Policy § 7(a).

**11.** JX 11 ¶ 4.

**12.** Tr. at 225–26. Kingsway also sought to pursue bad faith claims against Great American through American Country. On April 24, 2008, the judge presiding over the Interpleader Action ruled that Kingsway had standing to bring such claims because American Country was a party to the D & O Policy. Kingsway Post-Trial Op. Br. at 6 n. 23.

can be about Ruvoldt's stratagem, Kingsway wanted the entry of a judgment against the Former Directors with a dollar figure that exceeded the $10 million limits of the D & O Policy.[13] Kingsway could then sue on the assigned claims, arguing that the Former Directors could have settled earlier within the Policy's limits with the bulk of those funds compensating Kingsway and not going to litigation costs, but was prevented from doing so by the bad faith of Great American. That, anyway, is what I glean Kingsway's gambit to have been.

Beginning on July 16, 2007, Kingsway proffered a number of settlement proposals based on this convoluted approach. Every settlement proposal that Kingsway made after that time included an assignment of claims against Great American from the Former Directors to Kingsway. The "detriment" part was trickier. Kingsway knew that the Former Directors would not agree to have a judgment entered against them that would allow Kingsway to collect against their personal assets, particularly for an amount in excess of the $10 million D & O Policy limits. Kingsway tried to entice the Former Directors to its approach by suggesting that they agree to suffer a judgment at a high nominal amount and make an assignment of any claims they had against Great American but receive a covenant from Kingsway that it would not execute against their personal assets.

Throughout the remainder of 2007 and in early 2008, Kingsway and the Former Directors continued to talk settlement. Defendant Violetto, the former chief financial officer, also participated in these discussions. The premise of all of Kingsway's deals after July 16, 2007, which Kingsway refers to as the "core terms" of its settlement offers,[14] was that the Former Directors were to agree to a stipulated judgment and an assignment of claims but also receive some sort of comfort that Kingsway would not seek to recover against their personal assets in the form of covenants not to collect the settlement amount from the Former Directors or execute the judgment against their assets. Put bluntly, Kingsway wanted the Former Directors to give it a club to beat Great American with and to do so without Great American's consent.

By July of 2007, Kingsway knew from the Former Directors that Great American would not consent to any settlement that included an assignment of rights under the D & O Policy.[15] Likewise, it knew that, under the terms of the D & O Policy, no assignment of the Former Directors' interest would be binding upon Great American unless Great American had consented to the assignment.[16] Undaunted, Kingsway insisted that the Former Directors help it strengthen its bad faith case by including an assignment term.[17] The first of Kingsway's set of settlement offers reflecting the "core terms" was delivered orally on July 16, 2007. It transmitted two more draft settlement proposals to the Former Directors on September 4 and October 19, and one final settlement offer on January 17, 2008.[18] For their part, the Former Directors responded with various proposed changes and tried to find a meaningful settlement that would be beneficial to them and acceptable to Great American.

13. Tr. at 152.

14. Kingsway Post–Trial Op. Br. at 3.

15. Kingsway Post–Trial Ans. Br. at 3.

16. *See* D & O Policy § 9(j).

17. *See* JX 59; JX 70; JX 73.

18. JX 59; JX 70; JX 73.

At first, Kingsway's proposals required that judgments be entered against each of the Former Directors for $16 million, but later proposals reduced this requirement to a judgment against only one of the Former Directors, to be chosen by the Former Directors, for $13.5 million.

Great American was reticent to agree to a settlement engineered to set up a lawsuit against it. Kingsway knew this but argued that the Former Directors should settle, even if it caused them to breach the D & O Policy by not obtaining Great American's approval. As a witness at trial, Kingsway's counsel, Ruvoldt, admitted that Kingsway was asking the Former Directors to breach that contract and that such a breach could lead to the Former Directors becoming liable to Great American:

> [Q.] I think ... you acknowledged that you were asking my clients to breach the Great American D and O insurance policy, correct?
>
> A. I think what I said was it didn't matter to us whether they did or not. I understood the risk.
>
> Q. It didn't matter to who, [American Country] and Kingsway?
>
> A. It didn't matter to us, nor do I think it economically should matter to them.
>
> COURT: Well, I want you then to be clear. If they had settled this without prior permission of the insurer, they would be in breach, right?
>
> A. They would be in breach.
>
> Q. And "cost of defense" is defined as a loss in the policy?
>
> A. Cost of defense is defined as a loss.

Q. So they would be liable to Great American for all the costs of defense that Great American paid them up to that point in time.

A. They and the company would, yes.

Q. But they would be directly liable to Great American, right?

A. I believe the language is the company and the insured, yes.

Q. Well, then, answer my question. They would be directly liable to Great American.

A. Yes.[19]

Breaching the D & O Policy as part of a deal to give Kingsway more claims on which to sue Great American was not a trouble-free move for the Former Directors. As noted previously, Great American had advanced fees to the Former Directors under a reservation of rights.[20] Faced with a settlement that involved the Former Directors assigning claims against Great American to Kingsway, Great American would have understandably considered its own self-interest and contractual rights in responding.

One option for Great American, as Ruvoldt admitted at trial, would be to argue that the Former Directors had engaged in behavior that was outside the D & O Policy's area of coverage because it involved intentional fraud.[21] This could have resulted in a claim by Great American to recoup funds from the Former Directors.

Even more certainly, the settlements Kingsway proposed did not make the Fraud Action rear-view window material for the Former Directors. Rather, the subject matter of that suit would likely simply have arisen again in the bad faith

---

**19.** Tr. at 199–200; *see* D & O Policy §§ 3(d), (7)(a).

**20.** *See* Tr. at 141–42 (Ruvoldt: "If [the Former Directors] are finally found liable in a case where the company is under a reserva-

tion of rights, as I understand the policy, it would not be a covered claim.").

**21.** Tr. at 192.

litigation between Kingsway and Great American. Kingsway understood this and demanded that the Former Directors provide ongoing cooperation in the planned bad faith litigation and certain other proceedings as a term of settlement. In the October 19, 2007 settlement proposal in particular, Kingsway gave itself the authority to "designate counsel to appear on behalf of the [Former Directors], which counsel the [Former Directors] shall cooperate with."[22] That is, the plain terms of that proposal required the Former Directors to allow a party who had sued them for securities fraud to select their attorneys.

Various other terms of the several settlement offers were similarly motivated by Kingsway's desire to buttress its bad faith claims against Great American. For example, the September 4, 2007 proposal required that the Former Directors "stipulate and agree that [they] [were] liable to Plaintiffs for *negligent breach* of their fiduciary duties,"[23] because an intentional breach would have excluded the directors from coverage under the terms of the D & O Policy. That same proposal also contained an erroneous representation by the Former Directors that Great American had consented to the settlement.[24]

Eventually, the Former Directors firmly decided against agreeing to a settlement of the nature Kingsway was advocating. Kingsway then came up with the theory

that the Former Directors' refusal to settle was unreasonable and deprives them of their otherwise clear right to advancement. At the trial in this case on April 24, 2008, that was the only defense presented by Kingsway.

I address that defense now.

## II. *Legal Analysis*

Kingsway admits that Article Eighth of American Country's certificate of incorporation provides the Former Directors with a clear right to advancement for the defense of the Fraud Action. But it says that this clear right is subject to an implied condition of reasonableness,[25] and that the Former Directors are unreasonably defending against the Fraud Action when they could have gotten out of it cost-free. As a consequence for the Former Directors' obstinate refusal to recognize their own self-interest, Kingsway says they have forfeited their right to advancement. As Kingsway puts it, because the Former Directors "unreasonabl[y] reject[ed] [Kingsway's] settlement proposals, advancement of their expenses and fees in defending the [Fraud] Action is no longer necessary or reasonabl[e] under Section 145."[26] This is a truly astounding argument, in the sense that it is stunning for its lack of basis in law, logic, or common sense.[27]

Kingsway filed the Fraud Action accusing the Former Directors of intentional

---

22. JX 70 § 9(d).

23. JX 59 (emphasis added).

24. *Id.* § 7(i).

25. *See Citadel Holding Corp. v. Roven,* 603 A.2d 818, 823 (Del.1992) ("Under both the statute and the Agreement, the corporation's obligation to pay expenses is subject to a reasonableness requirement.").

26. Kingsway Post–Trial Ans. Br. at 1 n. 2.

27. Judge Flynn of the Chancery Division of the Cook County Circuit Court in Illinois re-

jected essentially the same argument in a dispute between Kingsway and American Country's former CEO, Dore, over an indemnification agreement that was governed by Delaware law. Kingsway Pre–Trial Op. Br. at 18. He reasoned that the purpose of Delaware law on advancement and indemnification would be eviscerated if an indemnitor could "cram down a settlement" by offering a proposal that cancels a defendant's advancement rights. Former Directors' Pre–Trial Ans. Br. Ex. A (Tr. of Oral Argument (Feb. 15, 2008) at 33, *Dore v. American Country Holdings, Inc. et al.,* Case No. 03 CH

fraud. The Former Directors are under *no obligation* to settle that case for anything other than a full release and dismissal of claims. If the Former Directors wish to vindicate their good names by having a court adjudicate the claims Kingsway itself has brought, they are entitled to do so and to put up a vigorous defense.[28] An important part of the policy rationale supporting indemnification and advancement is that corporate officials should be able to defend not only their pocketbooks, but also their good names.[29] It is cute for counsel for Kingsway to argue that the Former Directors' voluntary acceptance of a judgment against themselves in a fraud case has only a remote and speculative relationship to their reputations and future prospects to serve as directors of other corporations,[30] but entirely unconvincing. Perhaps Kingsway's counsel have entered into such voluntary and public judgments in malpractice cases as a basis for permitting plaintiffs to go after their firms' malpractice carriers. More likely, they have not. But what they have suggested that the Former Directors do is no different and if the analogy stings, it proves the pertinent point. No judgment in a fraud or other reputation-implicating case is cost-free.

Bottom line: the Former Directors have no duty at all to suffer a judgment just because a plaintiff like Kingsway wants one. If Kingsway wants to terminate the Fraud Action, it can dismiss its claims against the Former Directors with prejudice. Kingsway can then press whatever claims *it* has against Great American on *its* own. A defendant who faces claims of official wrongdoing and who is owed advancement rights is entitled to have those rights honored precisely so that she can defend her good name and personal wealth.

That general proposition is enough to dispose of this case. But the more particular facts also refute Kingsway's position.

8189, Hon. Peter J. Flynn, Cook County Circuit Court, County Department, Chancery Division). As Judge Flynn put it, if such a settlement offer could cut off a corporate official's right to advancement, a settlement offer "would become a weapon ... to punish and in effect, threaten a defendant. If you don't settle on my terms, not only are you going to be stuck defending this case, but you're going to have to defend it out of your own pocket. In litigation this size that's a pretty heavy threat." *Id.*

28.   Cf. *Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *6 (Del.Ch. June 18, 2002), *aff'd*, 820 A.2d 371 (Del.2003) (holding that a former director was entitled to advancement for claims that alleged he had misappropriated funds for his personal benefit).

29.   As Chief Justice Veasey explained in *Von-Feldt v. Stifel Financial Corp.*:

We have long recognized that Section 145 serves the dual policies of: (a) allowing *corporate officials to resist unjustified lawsuits, secure in the knowledge that, if vindi-* cated, the corporation will bear the expense of litigation; and (b) encouraging capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity.

714 A.2d 79, 84 (Del.1998); *see also Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005) ("Advancement is an especially important corollary to indemnification as an inducement for attracting capable individuals into corporate service.").

30.   E.g., Kingsway Post–Trial Ans. Br. at 3 ("[W]hile a judgment could *possibly* inflict reputational harm, whether a consent judgment that expressly provides for no admission of liability would *actually* inflict a reputational injury that caused economic harm is purely speculative.") (emphasis in original). *But see* Tr. at 203–04 (Ruvoldt: "There is some degree of reputational risk [to a judgment entered without admission of liability].... There are circumstances under which reputational damage could cause economic damage, yes.").

Kingsway has not proposed anything that promises peace to the Former Directors. Rather, all of its proposals seek to embroil the Former Directors in the dispute between Kingsway and Great American. Kingsway's bad faith suit had as its original premise that Great American had a duty to use the D & O Policy limits to pay Kingsway $8.5 million. But if the underlying conduct of the defendants in the Fraud Action was not covered by the D & O Policy—and if Kingsway's pleadings in the Fraud Action are taken literally, the conduct was not covered—one would think that Great American would raise that argument responsively in the bad faith suit.[31] This could result in the Former Directors facing the same charges they now face, but in a different forum. Furthermore, because the Former Directors would have breached their promise to Great American by settling without its consent and on terms clearly designed to make Great American a more vulnerable target for Kingsway, Great American would have every rational incentive to exercise all of its possible legal rights against the Former Directors, including seeking recoupment of the fees it had advanced.

In response to these realities, Kingsway has offered up a host of assurances by its outside counsel, Ruvoldt, who invented its stratagem for targeting Great American. These assurances can even been seen as humorous, because they include the notion that the Former Directors have nothing to fear if Great American sues them because Kingsway will indemnify them under American Country's charter! What could be more comforting?!

Likewise, Kingsway—which is now attempting to sue Great American for compensatory and punitive damages well in excess of the $10 million D & O Policy limits[32]—argues that the Former Directors have nothing to fear from Great American because Great American's filing of the Interpleader Action prevents it from enforcing the terms of the D & O Policy. Kingsway pulled out this argument for the first time in its post-trial answering brief, and it was therefore not fairly presented.[33] And even if it was, the argument does not sustain Kingsway's position. Kingsway claims the New York law it has cited suggests that if an insurer interpleads a policy, then it has no further interest in receiving any funds *within* the policy limits.[34] One can doubt whether that rationale de-

---

**31.** *See* Tr. at 192–93 (Ruvoldt testifying that Kingsway "runs the risk" of that defense to its bad faith claims and that "what the [Former Directors] are presently accused of could be a crime"); D & O Policy § 4(a)(2).

**32.** JX 34 ¶¶ 58–60.

**33.** *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *18 (Del.Ch. Aug. 18, 2006) (determining that an "argument [wa]s untimely because it was not addressed in the pre-trial order and was not raised until trial"); *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del.Ch.2001) (finding that a party waived an argument by not addressing it in its opening post-trial brief). In its post-trial opening brief, Kingsway brought up a related, but different argument. As best as can be

discerned from its cursory presentation, that argument was that because Great American "expressed its disinterest" in the D & O Policy, it would likely not have sued the Former Directors, and *that any breach of contract was therefore not material*. *See* Kingsway Post–Trial Op. Br. at 5. Kingsway did not cite any authority in support of that argument, which was phrased as a factual argument about Great American's motives, rather than as an argument that Great American was legally prohibited from asserting its rights under the D & O Policy as a result of having filed the Interpleader Action. In any event, Kingsway raised even that argument too late in the litigation for it to be fairly presented.

**34.** *See* Kingsway Post–Trial Ans. Br. at 3–4 nn. 15, 16.

nies Great American the right to make counter-claims in the situation Kingsway is trying to gin up. In Kingsway's dream, it takes a $13.5 million judgment against the Former Directors, and uses that sum as the focus of its bad faith claims (based on its own claims and the bad faith claims assigned to it by the Former Directors). In this scenario, Great American faces the prospect of paying out $23.5 million, or $13.5 million more than the D & O Policy limits.[35] The idea that Great American's filing of the Interpleader Action addressing the remainder of the D & O Policy limits forecloses it from exercising its pre-existing contractual rights in these circumstances is not self-evident, nor is it established by the cases Kingsway proffered for the first time in its very last brief.[36] Certainly, it seems reasonable for the insurer to defend itself by arguing that it went the extra mile in tendering defense costs in a situation where the underlying conduct alleged was outside the scope of coverage, and that if Kingsway and the Former Directors wish to (as Great American would undoubtedly put it) collude to expose Great American to liability beyond the Policy limits, then Great American should be free to use all its contractual rights, including its right to recoup the defense costs it previously advanced.

Again, however, what is most important is the fact that the Former Directors have no duty to put themselves in a position where questions like these are relevant to their lives. The Former Directors are clearly entitled to advancement and Kingsway is just as clearly forbidden from burdening their rights in the manner it has. If Kingsway wants to tangle with Great American, it is free to do so. But it is not free to withhold advancement from the Former Directors as some form of pressure strategy to extract assignments, judgments, breaches of contract, and pledges of cooperation from them. That is precisely what Kingsway has done, with no rational, good faith basis in law.

Sadly, Kingsway's stockholders will end up paying for this time- and resource-wasting litigation. In accord with the Supreme Court jurisprudence mandating "fees on fees" in advancement actions,[37] Kingsway must pay all the fees and expenses of the Former Directors' counsel.[38]

---

**35.** This is because the $13.5 million judgment is in addition to the $10 million D & O Policy limits, which will soon be entirely exhausted by defense costs, if it has not been already.

**36.** The reasoning behind those cases is that an insurer may not enforce technical requirements of an insurance policy when the insurer no longer has any interest in the dispute. *See, e.g., Provident Mut. Life Ins. Co. of Philadelphia v. Vergara,* 1995 WL 571874, at *2 (S.D.N.Y. Sept.27, 1995) ("The insurer waives precise compliance with the terms of a change of owner or beneficiary provision once it institutes an interpleader action and submits the insurance policy proceeds to the court, *thereby withdrawing itself from the action.*") (emphasis added); *Considine v. Considine,* 255 A.D. 876, 877, 7 N.Y.S.2d 834, 835–36 (1938) ("There were in the policy provisions reserving the right of the insured to change the beneficiary, regulating the manner in which such change might be made, as well as for formal assignments.... In this case all these provisions were waived on its part when the company interpleaded, paid the money into court and left the claimants to settle the controversy between themselves.") (internal citations omitted). That reasoning does not apply here, given Kingsway's own motives in seeking relief from Great American that well exceeds the Policy limits.

**37.** *Stifel Fin. Corp. v. Cochran,* 809 A.2d 555, 561 (Del.2002).

**38.** Even absent this rule, Kingsway's frivolous defense in this case would likely require the imposition of an award of attorneys' fees under the bad faith exception to the American rule. *Nagy v. Bistricer,* 770 A.2d 43, 64–65 (Del.Ch.2000); *see also* DONALD J. WOLFE AND MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHAN-

And, an all too often ignored factor in these kind of cases is that the stockholders will also end up footing the bill for the company's own counsel. The accumulation of cases like this, where the stockholders get it coming and going because of the corporation's refusal to honor mandatory advancement contracts, is regrettable, and at some point, a case of sufficient dollar value will arise such that a board is sued for wasting the corporation's resources by putting up a clearly frivolous defense.[39] On the upside, it may be difficult for even the most innovative of lawyers to outdo the defense advanced here, whereby the right to defend one's self is supposedly lost by a refusal to suffer an adverse judgment, commit a breach a contract, and become a potential target of a D & O insurer that has advanced substantial defense costs under a reservation of rights.

## III. *Conclusion*

For the foregoing reasons, the Former Directors are entitled to advancement of their legal fees in the Fraud Action and their fees and costs for prosecuting this case. Counsel for the Former Directors shall 1) promptly file an affidavit setting forth the basis for the fees and costs number, which the court shall use in its judgment,[40] and 2) submit a final judgment and order, with approval as to form, within 10 days.

CERY, § 13–3[b] (2008) ("[B]ad faith sufficient to justify an award of attorney's fees will be found where judicial intervention is necessary to secure clearly defined and established rights or where a defendant's actions are designed to force a party to resort to litigation for the purpose of causing unreasonable delay.").

39. One wishes that the tsunami of regret that swept over corporate America regarding mandatory advancement contracts would have been followed by the more careful tailoring of advancement provisions, with a diminishment (especially as to officers) of the mandatory term that seems to so bother directors faced with the responsibility of actually ensuring that the corporation honors its contractual duties once a (typically) former officer is sued or prosecuted for fraud or other serious wrongdoing. Although it is uncomfortable to cause the corporation to advance millions in fees to a former officer the current board believes engaged in serious misconduct, it

does stockholders no service for a board to refuse to do so when the advancement obligation is clear. If the directors in such a situation truly wish to serve the stockholders, they should fix what they can by revising the corporation's advancement obligations on a going-forward basis. To breach a contract because you do not like its terms while refusing to change it when you have the authority to do so is hard to explain as an act of appropriate fiduciary fortitude.

40. Unfortunately, there are several other ways in which Kingsway has made this litigation far more expensive and time-consuming than necessary. The baseless defense it was left with at trial is simply the last vestige of its defensive strategy. Kingsway is therefore in no position to delay this litigation further with nit-picking over the costs the Former Directors have had to incur to vindicate a clear legal right, when Kingsway could simply have done what it should from the beginning and honored its obligations.