**Louis D. PAOLINO, Jr., Plaintiff,**

v.

**MACE SECURITY INTERNATIONAL, INC., Defendant.**

**Civil Action No. 4462–VCL.**

Court of Chancery of Delaware.

Submitted: Nov. 18, 2009.
Decided: Dec. 8, 2009.
Revised: Dec. 14, 2009.

James Drnec, Esquire, Balick & Balick, P.C., Wilmington, DE, for Plaintiff.

Daniel V. Folt, Esquire, Matt Neiderman, Esquire, Travis A. Rossman, Esquire, Duane Morris LLP, Wilmington, DE, for Defendant.

## OPINION

LASTER, Vice Chancellor.

Plaintiff Louis D. Paolino, Jr. seeks indemnification and advancement of fees and expenses incurred in defending against counterclaims asserted against him by the defendant, Mace Security International, Inc. ("Mace" or the "Company"), in an arbitration proceeding that Paolino originally filed. Mace has moved to dismiss the complaint. I deny the motion. I stay the matter pending the outcome of the underlying arbitration to the extent it seeks indemnification. The action shall proceed summarily to the extent it seeks advancement. The parties agreed at oral argument that my ruling on the motion to dismiss would establish the scope of Paolino's legal right to advancement, and I therefore grant partial summary judgment in favor of Paolino establishing his right to advancement. I do not address the amount to which he is entitled, which will require further proceedings if the parties cannot agree.

## I. FACTS

The facts are drawn from the well-pled allegations of the complaint and the exhibits incorporated by reference in that pleading. As noted, the parties agreed at oral argument that there were no factual disputes that would affect Paolino's legal right to advancement.

### A. The Parties

Mace is a Delaware corporation headquartered in Horsham, Pennsylvania. Mace manufactures and markets personal defense and electronic surveillance products under the brand name "Mace."

Paolino served as Chairman and Chief Executive Officer of Mace from 1999 until his termination on May 20, 2008. At the time of his termination, his employment was governed by an employment agreement dated as of August 21, 2006 (the "Employment Agreement"). Under Section 7(v) of that agreement, if the Mace board of directors (the "Board") terminated Paolino's employment, then Paolino would be entitled to a large, additional lump sum cash payment, defined in the Employment Agreement as the "Severance Payment," and generally equal to 2.99 times his average annual compensation, bonus, and stock option grants over the past five years. Under Section 7(iv), if the Board terminated Paolino for "causing material harm to the Company by ... engaging in willful misconduct, or a felony," then Paolino would not be entitled to the Severance Payment.

### B. The Underlying Arbitration

On May 20, 2008, Mace terminated Paolino for cause under Section 7(iv) of the Employment Agreement. On June 6, Paolino responded by filing a demand for arbitration with the American Arbitration Association (the "Arbitration"). In his demand, Paolino claimed that he was terminated in retaliation for insisting that the Board publicly disclose certain material facts and events affecting the Company's business, which the Board refused to do. Paolino asserted that Mace breached his Employment Agreement by terminating him without paying him the Severance Payment. Paolino also claimed that Mace defamed him by disclosing in a Company press release and Form 8–K that Paolino was discharged for "willful misconduct." Paolino further contended that Mace failed to follow the formula set forth in the Employment Agreement for determining the value of certain stock options.

Faced with Paolino's demand, Mace was not content to play defense. Mace decided to play offense. On July 11, 2008, Mace filed its answer in the Arbitration and asserted counterclaims (the "Counterclaims"). According to the Counterclaims, "Paolino breached his contractual, statutory and common law duties owed to Mace, its Board of Directors and its Shareholders by, *inter alia,* refusing to follow the direction of Mace's Board of Directors, by refusing to properly inform and/or seek Board approval for actions taken by Paolino or under Paolino's direction; by refusing to comply with Mace's corporate governance principles and by-laws; by refusing to reduce corporate overhead and expense as directed by the Board of Directors; and, by inappropriately interfering with the Board of Directors' investigation of matters."

Mace further alleged that "Paolino breached his contractual, fiduciary, and statutory, [*sic.*] obligations owed to Mace, its Board of Directors and its Shareholders by engaging in a course of misconduct." Mace supported this allegation with a list of alleged misconduct including the "willful refusal to manage Mace" and the "abandonment of his oversight and supervisory responsibilities as Mace's CEO." Examples of the consequences of Paolino's alleged breaches of duty included the embezzlement of $300,000 by another Mace employee, the indictment of certain Mace employees for hiring illegal aliens, and an EPA raid of Mace's Vermont facility for improper storage of hazardous materials. Mace sought damages from Paolino "in the amount of $1,000,000, plus costs including reasonable attorneys' fees."

### C. Paolino Demands Indemnification And (Eventually) Advancement.

Article Six of Mace's Amended and Restated Bylaws dated October 16, 2007 (the "Bylaws") provides current and former directors and officers of the Company with broad and mandatory indemnification and advancement rights. It is undisputed that as a general matter, Paolino enjoyed rights to indemnification and advancement under the Bylaws.

By letter dated December 5, 2008, Paolino informed Mace that he "intend[ed] to seek any and all remedies available under the indemnification provisions of Article 6 of [the Bylaws] and [the] Delaware General Corporation Law." As a demand for advancement, the letter was at best infelicitously drafted. It spoke only of indemnification, did not mention advancement, and did not provide an undertaking. Indeed, based on the course of events pled in the complaint, I suspect that Paolino did not focus on the fundamental distinction under Delaware law between indemnification and advancement until the filing of the first amended complaint in May 2009. Mace did not respond to Paolino's December 5 letter.

By letter dated February 25, 2009, Paolino reiterated his demand for "indemnification," this time requesting the specific amount of "$100,000.00." This letter too spoke only in terms of indemnification. Although it used the word "advances," it did so with reference to advances made by Paolino to his attorneys and experts, not as a request for advancement from the Company. The letter did not provide support for the $100,000 request and did not include an undertaking.

By letter dated March 11, 2009, Mace responded to Paolino and informed him that he (i) was not entitled to indemnification and (ii) had not complied with the requirements for advancement, including by failing to provide an undertaking. Mace's response appears to have tipped off

Paolino to a potential distinction between indemnification and advancement under Delaware law. By letter dated March 26, Paolino finally requested indemnification "and advances" in the amount of $149,938.70 incurred to that point and for fees and expenses that he would incur in the future. His counsel represented on his behalf that Paolino undertook to repay any amounts advanced to him. Paolino did not provide any support for the $149,938.70 that he requested. Based on the pleadings, it appears that Mace did not respond to Paolino's March 26 letter.

### D. Paolino Sues.

On March 30, 2009, Paolino filed this action. The original complaint continued Paolino's focus on indemnification. It did not mention advancement or seek relief in the form of an advancement award.

On May 12, Paolino filed an amended complaint (the "Complaint"), which is the currently operative pleading. At this point Paolino added specific allegations regarding advancements and finally requested relief in the form of an advancement award. Despite pleading that the Arbitration remained on-going, the Complaint retained Paolino's allegations regarding indemnification and continued to request relief in the form of ultimate indemnification.

Importantly, the Complaint seeks advancement and indemnification only for the Counterclaims. The Complaint does not seek advancement or indemnification for the claims Paolino initially asserted in the Arbitration, even though Paolino referred to the Arbitration in its entirety in various letters to Mace. Paolino also does not seek advancement or indemnification for an administrative proceeding he initiated before the Department of Labor, even though Paolino similarly referred that proceeding in his correspondence with Mace. During oral argument, Paolino's Delaware counsel confirmed these limitations on the relief Paolino is now seeking. I thus consider only the Counterclaims. At the same time, I take into account and hold Mace to its position that it is not humanly possible to determine what litigation activity or related fees and expenses should be allocated to the Counterclaims versus what should be attributed to Paolino's offensive claims. That argument, vigorously advanced by Mace as a reason for me to deny advancement to Paolino entirely, has obvious reciprocal implications should a right to advancement exist.

Mace moved to dismiss the Complaint, and the parties agreed to a briefing schedule that was leisurely for a summary advancement proceeding. Unlike many advancement litigants, Paolino did not cross-move for summary judgment on his right to advancement. I therefore asked at oral argument whether there were any disputed issues of fact that would bar me from determining whether Paolino had a legal right to advancement in connection with the Arbitration. The parties agreed that there were none and that the only disputes about the right to advancement were over issues of law. This agreement does not extend to the amounts Paolino seeks, where disputed issues of fact may abound.

## II. ANALYSIS

A motion to dismiss will be granted only if it is reasonably certain that the plaintiff would not be entitled to relief under any set of facts that could be proven to support the claims asserted. *Feldman v. Cutaia,* 951 A.2d 727, 731 (Del.2008). The Complaint easily clears the bar, and I therefore deny the motion to dismiss. Because it would be premature to litigate the merits of indemnification issues while the Arbitration remains live, I stay the action to the extent it seeks indemnification. In

light of the parties' agreement that my ruling on the legal issues presented by the motion to dismiss would resolve the scope of Paolino's right to advancement, I enter partial summary judgment establishing that legal right. If the parties cannot agree on the amount of advancement to which Paolino is entitled, then further proceedings will be required.

### A. Paolino's Claim For Indemnification Will Be Stayed.

 I first consider whether Paolino's indemnification claim should be stayed. I raise this issue *sua sponte* because indemnification and advancement are "legally quite distinct." *Advanced Mining Sys., Inc. v. Fricke*, 623 A.2d 82, 84–85 (Del.Ch. 1992) (Allen, C.). It is generally premature to consider indemnification prior to the final disposition of the underlying action. *See, e.g., Sun–Times Media Group, Inc. v. Black*, 954 A.2d 380, 401–08 (Del. Ch.2008) (describing wasteful process that would result from addressing indemnification prior to the final disposition of the underlying proceeding); *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *9 (Del.Ch. Oct. 19, 2000) ("As a matter of litigative efficiency, it makes little sense for this court to decide claims for indemnification—as opposed to claims for advancement of litigation expenses—in advance of a non-appealable final judgment."). One reason is that to the extent indemnification is authorized under Sections 145(a) and (b), it requires state of mind determinations that may turn on evidence or findings of fact in the underlying proceeding. *See* 8 *Del. C.* §§ 145(a) & (b). Another reason is that if the covered person succeeds on the merits or otherwise in defending the underlying proceeding, then he will have a right to mandatory indemnification under Section 145(c) without the need for state of mind determinations to be made. *See* 8 *Del. C.* § 145(c); *Perconti v. Thornton Oil*

*Corp.*, 2002 WL 982419, at *4 & n. 22 (Del.Ch. May 3, 2002).

Paolino and Mace have not articulated any reason why I should address indemnification at this juncture. I suspect that Paolino sought indemnification because he does not appear to have zeroed in on the difference between indemnification and advancement until the filing of the first amended complaint, at which point he added the advancement claim and left in the indemnification claim. At oral argument, Paolino's counsel agreed that a ruling on advancement would protect his client's rights fully while the Arbitration remains on-going, and Mace's counsel did not articulate any reason for me to address indemnification other than Mace's view that their arguments should dispose of both indemnification and advancement.

 This Court possesses the inherent power to manage its own docket, including the power to stay litigation on the basis of comity, efficiency, or simple common sense. *See Salzman v. Canaan Capital Partners, L.P.*, 1996 WL 422341, at *5 (Del.Ch. July 23, 1996) ("To enable courts to manage their dockets, courts possess the inherent power to stay proceedings."); *Phillips Petroleum Co. v. ARCO Alaska, Inc.*, 1983 WL 20283, at *4 (Del.Ch. Aug. 3, 1983) (granting stay in favor of pending arbitration based on "common sense"). I do not perceive any need to address indemnification issues while the Arbitration is pending. It would be inefficient and wasteful for the parties and me to deal with indemnification while the underlying landscape continues to evolve. A stay makes sense under these circumstances.

I will therefore stay this action to the extent it seeks indemnification until the final disposition of the Arbitration. If circumstances change and some determination as to the scope of Paolino's indemnifi-

cation right is needed, then Paolino or Mace can apply to lift the stay. In doing so, the party seeking to lift the stay will need to show why the indemnification issue is ripe and capable of resolution prior to the outcome of the Arbitration.

### B. Paolino's Claim For Advancement Will Proceed.

In contrast to Paolino's claim for indemnification, his claim for advancement can and should proceed in summary fashion. Paolino seeks to enforce a mandatory advancement right granted to him under Mace's Bylaws, which implement the permissive authority granted to Mace by Section 145 of the General Corporation Law. Section 145(e) empowers Delaware corporations to pay expenses incurred by current directors and officers in defending any civil, criminal, administrative or investigative action, suit or proceeding "in advance of the final disposition of such action." 8 *Del. C.* § 145(e).

Mace chose to provide a broad right to mandatory advancement for expenses incurred in defending any action, suit, or proceeding for which indemnification might potentially be available. Mace established this framework by first granting in Section 6.01 of its Bylaws a right to mandatory indemnification "to the fullest extent permitted by Delaware law." Using customary language, Section 6.01 of the Bylaws states:

Each person who was or is made a party ... in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she ... is or was a director or officer of the Corporation ... shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law ... provided, however, that except as

provided in paragraph (b) hereof, the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation.

Compl. Ex. G, § 6.01. Notably, Mace qualified its grant of mandatory indemnification with a variant of a common carve-out eliminating indemnification for any "proceeding (or part thereof) initiated by [an indemnitee]" without prior Board approval.

With Section 6.01 having established a right to mandatory indemnification, Section 6.02 next grants a right to mandatory advancement keyed off of the scope of the indemnification right. Section 6.02 states:

The right to indemnification conferred by this Article 6 shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition, including, without limitation, attorney's fees, expert fees and all costs of litigation. Subject to the tender to the Corporation of any undertaking then required under the Delaware General Corporation law with respect to the repayment amounts of amounts advanced, any such expenses, including, without limitation, attorney's fees, expert fees, and all costs of litigation, shall be paid automatically and promptly upon tender by the director, officer, or employee, as applicable, of a demand therefore.

Compl. Ex. G.

Section 6.02 thus grants broad and mandatory advancement rights to any covered person faced with "defending" a "proceeding" in which indemnification theoretically could be available. Importantly, this advancement right encompasses not only any proceeding for which Paolino

could be indemnified under Section 145(a) or (b), but also any proceeding for which indemnification could be required under Section 145(c). The advancement right picks up this possibility through Section 6.01, which incorporates Section 145(c) by providing for indemnification "to the fullest extent authorized by the Delaware General Corporation Law." *See Zaman v. Amedeo Holdings, Inc.*, 2008 WL 2168397, at *16 (Del.Ch. May 23, 2008) (interpreting "fullest extent" bylaw provision to encompass mandatory indemnification under Section 145(c)); *Cochran v. Stifel Fin. Corp.*, 2000 WL 1847676, at *8 (Del.Ch. Dec. 13, 2000) (interpreting "fullest extent" contract provision to encompass mandatory indemnification under Section 145(c)), *aff'd in pertinent part*, 809 A.2d 555 (Del.2002); *Dunlap v. Sunbeam Corp.*, 1999 WL 1261339, at *5 (Del.Ch. July 9, 1999) (holding that advancements were required under mandatory provision so long as mandatory indemnification under Section 145(c) remained a possibility).

Under this plain and unambiguous provision, Paolino has stated a claim for advancement with respect to the Counterclaims. *See, e.g., Citadel Holding Corp. v. Roven*, 603 A.2d 818, 824 (Del.1992) (applying plain meaning of advancement provision). In facing the Counterclaims, Paolino is "defending" a "proceeding" to which his right of indemnification could extend. He is a "person . . . involved in [a] proceeding . . . by reason of the fact that he . . . was a director or officer" of Mace. If he ultimately satisfies the state of mind requirements of Section 145(a) and (b), then he will be entitled to mandatory indemnification under Section 6.01. If he is successful "on the merits or otherwise" in defending against the Counterclaims, then he will be entitled to mandatory indemnification under Section 6.01 and Section 145(c).

### 1. Paolino Is "Defending" Against The Counterclaims.

■ In an effort to avoid this straightforward analysis, Mace argues that Delaware precedents have interpreted the concept of "defending" in a counter-intuitive manner that prevents me from accepting the obvious fact that Paolino is "defending" against the Counterclaims. Mace cites *Roven* and *Zaman*, in which the Delaware Supreme Court and this Court recognized that a covered person could assert counterclaims as part of his defense and hence be entitled to advancements for pursuing the Counterclaims. Mace argues that a mirror-image rule should apply, such that if a covered person initiates a proceeding and a corporation asserts counterclaims defensively, those claims are not defensive. In Mace's world, the Counterclaims are part of the covered person's offensive proceeding and do not qualify for advancements.

This linguistically odd approach reads far too much into the *Roven* line of decisions. These cases recognized the common sense proposition that when someone has been sued and is defending against claims, part of that defense frequently involves the assertion of affirmative defenses and counterclaims. In *Roven*, the Delaware Supreme Court held that advancement was required for the compulsory counterclaims asserted in that case, reasoning that "the term 'defense' has a broad meaning" and that by asserting the counterclaims, Roven (the covered person) was defending himself for purposes of advancement. 603 A.2d at 824. Subsequent cases refined the test. *See, e.g., Reinhard & Kreinberg v. Dow Chemical Co.*, 2008 WL 868108, at *3 (Del.Ch. Mar. 28, 2008); *Gentile v. SinglePoint Fin., Inc.*, 787 A.2d 102, 109–10 (Del.Ch.2001). In *Zaman*, Vice Chancellor Strine explained that to qualify as "defending" for purposes of ad-

vancement, a counterclaim (i) must be "advanced to defeat, or offset" the claims against the covered person and (ii) qualify as a compulsory counterclaim under the prevailing test employed under Federal Rule of Civil Procedure 13 and its Delaware analog. 2008 WL 2168397, at *35.

Mace seeks to flip these precedents into a mirror-image concept of "not defending," which I think of as "suing." Under Mace's view, *Roven* and its progeny imply that when a covered person is "suing," that affirmative act includes responding to any counterclaims or affirmative defenses that the defending party asserts. In defending against the counterclaims, the covered person is engaged in the act of "not defending" because he is continuing to engage in the affirmative act of "suing." This is an odd, artificial, and counter-intuitive construct.

*Roven* and its progeny address what happens when a covered person has been sued, is defending, and seeks to play offense as part of that defense. I find it logical and intuitive that some degree of offensive response—to a degree now clarified by *Zaman*—can legitimately be part of "defending." *Roven* and its progeny do not support a mirror-image concept of "not defending."

Equally important, Mace's argument misperceives the core public policies underlying Section 145. "We have long recognized that Section 145 serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits, secure in the knowledge that, if vindicated, the corporation will bear the expense of litigation; and (b) encouraging capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity." *Von-Feldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del.1998). To fulfill these fundamental policies, Delaware law starts from the perspective of the covered person. For purposes of determining whether someone is "defending" a proceeding, the operative question is not "who started the lawsuit?" as Mace suggests, but rather "has a claim been asserted against the covered person?" If a claim has been asserted, whether as an initial claim, counterclaim, or third party claim, then the covered person is "defending." Our law has even recognized that a covered person was "defending" against threatened claims when a corporation took discovery of the covered person in a different action that the covered person asserted as a plaintiff. *See Schoon v. Troy Corp.*, 948 A.2d 1157, 1169–70 (Del.Ch.2008).

Although the *Roven* line of cases does not support the argument that Mace advances, it does establish two principles which further undercut Mace's theory. First, *Roven* recognized that counterclaims, even compulsory ones, are "separate causes of action" for purposes of Section 145 analysis. 603 A.2d at 824. The Supreme Court did not simply note that Roven was a defendant according to the caption of the case and conclude that he was "defending" as to the case as a whole. The Supreme Court instead considered the counterclaims individually, as separate causes of action, to determine if they qualified for advancement. This is consistent with Delaware's overarching approach to Section 145, in which claims are evaluated individually or in appropriate groupings. *See, e.g., Zaman*, 2008 WL 2168397, at *25–33 (engaging in claim-by-claim analysis); *Cochran*, 2000 WL 1847676, at *4 n. 10 (analyzing separate claims together where they could be "sensibly segregated into groups"). Mace's approach, by contrast, uses a proceeding-wide determination in which someone is either "suing" or "defending" for purposes of the entire

case. That analysis finds no support in our law.

Second, *Roven* and its progeny, and particularly *Zaman*, recognize that an "all-or-nothing" proceeding-based analysis is contrary to Delaware's public policy. In *Zaman*, for example, Vice Chancellor Strine found it "hard to understand the policy basis" for reading *Roven* as holding that a covered person "should have his cost of playing offense paid simply because the company sued him first and he is now forced to play offense in the corporation's chosen forum or give up the right to do so later." 2008 WL 2168397, at *34. Such a rule would create an additional disincentive for corporations to pursue remedies against covered persons, because the covered person could fire back with any conceivable claim against the corporation, however unrelated, and have the costs funded by the corporate treasury. The broad and mandatory advancement rights that corporations continue to grant or leave in place, despite repeated suggestions by this Court that the rights be more narrowly tailored,[1] already create a disincentive for corporations to pursue remedies when they know they must also fund the defense. Just as it does not make sense to force a corporation to fund all of a covered person's counterclaims simply because the corporation filed suit first, it does not make sense to relieve a corporation of its advancement obligations for all of the claims it asserts against a covered person, simply because the covered person sued first. To do so would deny the covered person the protection to which he or she is entitled and impose a significant cost (in the form of forfeiting advancement rights for counterclaims) on individuals who sought to enforce their own rights by filing suit.

I therefore reject the suggestion that a mirror image of the *Roven/Zaman* rule should apply to corporations. When a corporation plays offense, the covered person it claims against is "defending."

### 2. The Carve–Out Does Not Apply To The Counterclaims.

I next take up Mace's contention that the carve-out in Section 6.01 of the Bylaws forecloses advancement. To review, the carve-out provides that "except as provided in paragraph (b) hereof, the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by

---

1. *See Barrett v. American Country Holdings, Inc.*, 951 A.2d 735, 747 n. 39 (Del.Ch.2008) ("One wishes that the tsunami of regret that swept over corporate America regarding mandatory advancement contracts would have been followed by the more careful tailoring of advancement provisions, with a diminishment (especially as to officers) of the mandatory term that seems to so bother directors faced with the responsibility of actually ensuring that the corporation honors its contractual duties once a (typically) former officer is sued or prosecuted for fraud or other serious wrongdoing. Although it is uncomfortable to cause the corporation to advance millions in fees to a former officer the current board believes engaged in serious misconduct, it does stockholders no service for a board to refuse to do so when the advancement obligation is clear. If the directors in such a situation truly wish to serve the stockholders, they should fix what they can by revising the corporation's advancement obligations on a going-forward basis. To breach a contract because you do not like its terms while refusing to change it when you have the authority to do so is hard to explain as an act of appropriate fiduciary fortitude."); *see also Stifel Financial Corp. v. Cochran*, 809 A.2d 555, 562 (Del.2002) (noting that corporations are not prejudiced by our courts taking an expansive reading of "fullest extent" advancement and indemnification provisions because the corporations are free to tailor those provisions narrowly), *Jackson Walker LLP v. Spira Footwear, Inc.*, 2008 WL 2487256, at *9 (Del. Ch. June 23, 2008) (same).

such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation." Section 6.02 provides that "[t]he right to indemnification conferred by this Article 6 shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition." Mace argues that the carve-out precludes indemnification for the Arbitration as a whole, and therefore it necessarily precludes advancement for the Arbitration as a whole.

■ As a threshold matter, the reference to "except as provided in paragraph (b)" is puzzling. Article 6 does not contain a "paragraph (b)." The article instead has sections numbered 6.01 through 6.07. It is thus not clear what was intended to be excluded from the carve-out. I suspect that in some prior iteration of the Bylaws, a predecessor to Article 6 contained subparagraphs denoted by letters. I further suspect that the predecessor article was revised at some point to adopt the current numbering system, but the drafters failed to correct the reference to "paragraph (b)." If "paragraph (b)" in fact refers to Section 6.02, albeit using a vestigial nomenclature, it could create ambiguity for applying the carve-out in the advancement context. As I noted at oral argument, ambiguities in advancement provisions generally are construed against the corporation who drafted them. *See, e.g., Thompson v. Williams Cos.*, 2007 WL 2215953, at *3 (Del.Ch. July 31, 2007); *Greco v. Columbia/HCA Healthcare Corp.*, 1999 WL 1261446, at *13 (Del.Ch. Feb. 12, 1999). Neither Mace nor Paolino has made any argument based on this language, and I therefore will not consider it further.

■ Ignoring the stray language, the carve-out does not exclude the Counterclaims from the scope of the indemnification right. The obvious purpose of the carve-out is to prevent situations in which a corporation might be forced to provide indemnification for claims, counterclaims, or third party claims asserted by the covered person. Absent the exclusion, a plaintiff could seek mandatory indemnification as a "party" to the proceeding. The "part thereof" is designed to address "'part proceedings' such as permissive counterclaims or third-party claims that are offensive as opposed to defensive actions." *Sun–Times*, 954 A.2d at 407. Translated into the world of advancements, the covered person could seek advancement for counterclaims asserted defensively, as permitted by the *Roven/Zaman* line of cases discussed above.

Here, the carve-out does not apply. Paolino is not seeking advancements or indemnification "in connection with a proceeding (or part thereof) initiated by [him]." He is seeking indemnification for the Counterclaims, which are parts of the underlying proceeding that Paolino did not initiate. The Counterclaims were rather parts of the proceeding that were initiated by Mace. This interpretation of the plain language of the carve-out is supported by Delaware's general approach to advancement and indemnification issues, discussed in the preceding section, which examines those issues on a claim-by-claim basis.

My reading of the carve-out as not extending to the Counterclaims is also dictated by the interaction of Section 6.1 of the Bylaws with Section 145(c). Mandatory indemnification under Section 145(c) extends to any covered person who was successful not only "in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section," but also "in defense of any claim, issue or matter therein." Thus if Paolino is successful on the merits or otherwise in defending

against the Counterclaims in the Arbitration, he will be entitled to mandatory indemnification for his fees and expenses under Section 145(c). As noted above, Section 6.02 of the Bylaws grants a right to mandatory advancements in proceedings for which indemnification could be available under Section 145(c).

■ A bylaw provision that conflicts with a mandatory provision of the General Corporation Law or the certificate of incorporation is *ultra vires* and void. *See* 8 *Del. C.* § 109(b); *Sun–Times,* 954 A.2d at 407. If the carve-out applied to entire "proceedings" and precluded indemnification for counterclaims in proceedings initiated by the covered person, it would conflict with Section 145(c). I will not read the carve-out in a way that would render it invalid. Paolino thus will be entitled to mandatory indemnification under Section 145(c), notwithstanding the carve-out, if he is successful on the merits or otherwise on the Counterclaims. Because Section 6.02 grants mandatory advancement for any claim where the covered person theoretically could be indemnified under Section 145(c), the mandatory advancement right necessarily extends to the Counterclaims.

I therefore conclude that the carve-out does not bar Paolino from receiving advancements for the part of the Arbitration in which he is defending against the Counterclaims.

### 3. The Employment Agreement Does Not Alter Paolino's Rights.

■ Last, I consider Mace's assertion that the Counterclaims do not arise "by reason of the fact" that Paolino was CEO and Chairman of Mace, but rather out of his Employment Agreement. Given the allegations of the Counterclaims, this is a surprising argument. Mace's Counterclaims assert broadly that "Paolino breached his contractual, statutory and common

law duties owed to Mace," including his "fiduciary" obligations. They recite a list of actions that Paolino allegedly took or failed to take in his capacity as Chairman and Chief Executive Officer of Mace, including the "willful refusal to manage Mace" and the "abandonment of his oversight and supervisory responsibilities as Mace's CEO." They facially implicate Paolino's duties as an officer and director and fall within the scope of Section 6.01.

As legal authority for its counterfactual position, Mace relies on *Cochran* and *Weaver v. ZeniMax Media, Inc.,* 2004 WL 243163 (Del.Ch. Jan. 30, 2004). Neither case supports the idea that when an employment agreement is at issue, Section 145 goes out the window. The cases instead show that Section 145 will not apply when the parties are litigating a specific and personal contractual obligation that does not involve the exercise of judgment, discretion, or decision-making authority on behalf of the corporation. Vice Chancellor Strine's decision in *Cochran* and his subsequent opinions in *Reddy v. Electronic Data Systems Corp.,* 2002 WL 1358761 (Del.Ch. June 18, 2002), and *Zaman* best illustrate these principles.

In *Cochran,* the plaintiff Robert M. Cochran had a right to mandatory indemnification from Stifel Financial Corporation, the parent company of his former employer, Stifel Nicolaus & Company, Inc. Because the distinction is not pertinent to this opinion, I will refer to them together as "Stifel."

Cochran sought indemnification from Stifel for two separate actions. In the first underlying proceeding, Cochran was found guilty after trial on numerous counts of securities fraud, but his convictions were overturned on appeal. Cochran sought indemnification on the grounds that he succeeded on the merits or otherwise in defending the criminal proceeding.

In the second underlying proceeding, Stifel brought an arbitration against Cochran for breach of his employment agreement. Stifel asserted that Cochran had failed to repay portions of monthly draws that exceeded the maximum compensation he was permitted under a formula in the agreement. Stifel also asserted that Cochran failed to repay an incentive loan extended to him under his agreement pursuant to a note that became due and payable when his employment was terminated for cause. In addition to these claims, Stifel asserted that Cochran had breached his fiduciary duties and had violated his non-compete. Cochran lost on the compensation claim and on the promissory note but won on the breach of fiduciary duty claim. Stifel withdrew the non-compete claim. The arbitration award was confirmed by judgment and became final.

In the indemnification action before Vice Chancellor Strine, Stifel argued that Cochran was not entitled to indemnification for repaying his excessive compensation or paying off his promissory note because they resulted from litigation over specific contractual obligations. Cochran countered that he only received the compensation and the incentive loan because he was a director, officer and employee of Stifel, and thus the claims were necessary brought "by reason of" his status in those covered capacities. Notably Stifel did not claim Cochran should not be indemnified for the breach of fiduciary duty claim.

Vice Chancellor Strine resolved the matter by pointing out the implications of owing money under a specific contractual obligation.

> When a corporate officer signs an employment contract committing to fill an office, he is acting in a personal capacity in an adversarial, arms-length transaction. To the extent that he binds himself to certain obligations under that contract, he owes a personal obligation to the corporation. When the corporation brings a claim and proves its entitlement to relief because the officer has breached his individual obligations, it is problematic to conclude that the suit has been rendered an "official capacity" suit subject to indemnification under § 145 and implementing bylaws.

*Cochran*, 2000 WL 1847676, at *6. This makes perfect sense. Recall that in the arbitration, Cochran had been ordered to refund his unearned compensation and pay off his loan. To allow Cochran to obtain indemnification from Stifel for those payments would deprive Stifel of the specific contractual rights it possessed under the employment agreement. *See id.* at *6 ("had the parties intended that Cochran be permitted (by virtue of indemnification from [Stifel]) not to repay the Promissory Note in the event of his contractually proper termination for cause, the Note could have said this"). It would have created a circular oddity in which Cochran paid the amounts, then Stifel paid him back.

As this case and others like *Reddy*, *Zaman* and *Weaver* demonstrate, corporations bent on limiting their exposure to mandatory indemnification and advancement provisions sought to read *Cochran* broadly as saying that if an individual agrees to serve in a covered capacity pursuant to an employment agreement, then his duties become a personal contractual obligation. This in turn allowed the corporations to argue that if the individual was sued for wrongdoing or misconduct in his official capacity, then the suit arose out of his personal contractual obligation and was not "by reason of" an official capacity for purposes of Section 145.

This is not what *Cochran* held. Vice Chancellor Strine's analysis of the underlying arbitration focused on the formula-based compensation calculation, *see id.* at

*7, and on the wholly contractual note claim, *see id.* at *8. Moreover, in the same decision, he granted Cochran indemnification for the breach of fiduciary claim in the arbitration and for the criminal proceeding. In both instances, Cochran had been "successful on the merits or otherwise" in defending claims brought against him in an official capacity. *Id.* at *8–11. If the presence of an employment agreement had the capacity-altering effect envisioned by those who read *Cochran* expansively, then Vice Chancellor Strine could not have granted indemnification on these claims.

In *Reddy*, Vice Chancellor Strine took the opportunity to further clarify the scope of *Cochran*. Michael T. Reddy sold his company to Electronic Data Systems Corp. ("EDS") in a deal that provided for an earn-out. Reddy took over an EDS division that included his former company. After the United States Attorney for the Southern District of New York indicted Reddy for financial fraud, EDS filed suit, alleging that Reddy fraudulently inflated the performance of his division to increase the size of the earn-out and generate greater incentive-based compensation for himself. EDS did not include a count for breach of fiduciary duty; EDS only claimed breach of contract, negligence, and common law fraud. Reddy sought advancement for both the criminal proceeding and the EDS action under a bylaw provision that made both indemnification and advancement mandatory "as, and to the fullest extent permitted by, Section 145."

EDS first argued that it need not advance funds to Reddy because he had not been accused of breaching his fiduciary duties. Vice Chancellor Strine rejected this argument.

> [T]he negligence, gross negligence, common law fraud, and contract claims brought against Reddy all could be seen as fiduciary allegations, involving as they do the charge that a senior managerial employee failed to live up to his duties of loyalty and care to the corporation. Most critically, all of the misconduct alleged by EDS involves actions Reddy took on the job in the course of performing his day-to-day managerial duties. Likewise, the Criminal Action also involves conduct solely involving Reddy's actions in his official capacity.

*Id.* at *6. Vice Chancellor Strine thus made clear that both the theory pled and the nature of the underlying conduct figure into the official capacity determination, thereby again rejecting (as he had in *Cochran*) the extreme position that only a claim explicitly styled as asserting a cause of action for breach of fiduciary duty would give rise to rights under Section 145.

EDS also advanced the narrower argument that under *Cochran*, it was not required to advance fees for asserted breaches of Reddy's employment agreement. Vice Chancellor Strine described *Cochran* as involving "very unusual circumstances" in which the officer sought to have the corporation indemnify him for excessive compensation that he was contractually obligated to return and for amounts due on a promissory note that he was contractually obligated to pay. *Id.* at *7. Vice Chancellor Strine then returned to the importance of the nature of the allegations in the underlying proceeding:

> Critically, the *Cochran* case did not … involve a situation in which the officer's alleged breach of his employment agreements was argued to be the identical conduct that was also averred to be a breach of fiduciary duty. Rather, that case involved an unusual situation in which the officer would have received a windfall if indemnification was permitted, which would have been contrary to the expectations of rational contracting

parties. Indeed, on appeal, the Supreme Court expressly noted that the arbitrators had found that the plaintiff's conduct as a corporate official was "irrelevant" to the contract dispute before them. *Id.* at *7. Vice Chancellor Strine noted that Reddy was not seeking to obtain indemnification for payments he had agreed to make under an employment agreement. Reddy instead was seeking advancement and would be obligated to repay those advancements if he ultimately was not entitled to indemnification. *Id.* The circularity that existed in *Cochran* did not exist in *Reddy*, and there was no risk of a windfall to the covered person. Reddy was therefore entitled to advancement for actions brought against him in an official capacity, notwithstanding the framing of the claims as breaches of contract.

Most recently in *Zaman*, the defendants argued that the plaintiffs were not entitled to advancement in defending claims that they had used company credit cards for personal expenses while acting as managers of the New York Palace Hotel. Seeking to invoke *Cochran*, the defendants argued that the claim was a simple dispute over contractual reimbursement. Vice Chancellor Strine rejected this argument, noting that the claims were "grounded in their alleged misuse of the substantial fiduciary responsibility they were given as key managerial agents." 2008 WL 2168397, at *28. Distinguishing *Cochran*, he noted that the case did not present a situation where the plaintiffs were "alleged to have committed merely a breach of a specific term of a contract." *Id.* at *28 n. 106. He further observed that if the defendants were ultimately shown "after an adjudication on the merits that the [plaintiffs] were in fact bilking the Palace Hotel and its owners with excessive credit card charges, they will not be entitled to indem-

nification for any judgments against them." *Id.*

*Cochran*, *Reddy*, and *Zaman* are thus fully consistent with the overarching test announced by our Supreme Court for determining when a covered person has been sued "by reason of" his or her official capacity: "[I]f there is a nexus or causal connection between [a claim] and one's official capacity, those proceedings are 'by reason of the fact' that one was a corporate officer, without regard to one's motivation for engaging in that conduct." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 215 (Del.2005). The requisite connection is established "if the corporate powers were used or necessary for the commission of the alleged misconduct." *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1011 (Del. Ch.2007).

Under this test, a claim against a director or officer for matters relating to the corporation will typically fall within Section 145, even if the individual was a party to an employment agreement. *Cochran* did not establish an exception for employment agreements. *Cochran's* holding that a personal contractual obligation lacked the necessary nexus rested on both the specificity of the contractual obligation and the circularity of the covered person being obligated to make the called-for payment, then obtaining it back through indemnification. Section 145(b) prohibits precisely this circularity in derivative lawsuits by preventing a corporation from indemnifying a covered person for judgments recovered by the corporation. *See* 8 *Del. C.* § 145(b). As *Reddy* and *Zaman* explain, this two-part rationale has little purchase in the advancement context because the covered person is always obligated to repay the fees advanced if not ultimately entitled to indemnification, thereby eliminating the problem of circularity.

This does not mean that a *Cochran* argument cannot succeed in an advancement case. It does mean that the claim for which the corporation seeks to avoid advancement must clearly involve a specific and limited contractual obligation without any nexus or causal connection to official duties.

*Weaver* provides an example. Christopher S. Weaver had been Chief Technology Officer and a director of ZeniMax Media, Inc., and the terms of his employment were governed by an Executive Employment Agreement. After Weaver was terminated, he sued for severance benefits. ZeniMax counterclaimed. In Count I, it asserted a claim for mismanagement and breach of fiduciary duty. 2004 WL 243163, at *1. ZeniMax eventually accepted its obligation to advance for Count I. In Count II, however, ZeniMax asserted that Weaver "fail[ed] to devote his full time and efforts to the business of the Company," "was paid for non-work related absences in excess of his allotted 4 week [paid] annual vacation," and "wrongly received reimbursement for travel and other expenses." *Id.* at *3. ZeniMax's bylaws provided for mandatory advancement to officers and directors but not to employees.

Applying *Cochran*, Vice Chancellor Noble held that the allegations in Count II "address employee issues arising out of his personal capacity—not issues based on Weaver's status as an officer or director." *Id.* at *4. He later noted that "Taking too much vacation time and submitting fraudulent travel expenses are examples of personal conduct by employees." *Id.* Unlike in *Zaman*, there was "no alleged use (or abuse) by Weaver of corporate authority or position in the conduct challenged in Count II." *Id.* at *5. As a result, *Weaver* denied advancement for Count II.

In this case, the Counterclaims have been asserted by reason of Paolino's service as CEO and Chairman of Mace. They directly challenge Paolino's conduct generally and his alleged failings in his official capacity. The fact that Paolino and Mace were parties to the Employment Agreement does not convert Paolino's duties as CEO into a personal contractual obligation like the loan repayment or formula-based compensation reimbursement in *Cochran*. Nor can the Counterclaims credibly be portrayed as the type of limited, garden variety dispute between an employer and employee at issue in *Weaver*. The Employment Agreement does not alter the fact that the Counterclaims arise were asserted by reason of the fact that Paolino was an officer and director of Mace.

## C. The Scope Of Paolino's Advancement Right

██ The parties have agreed that my ruling on the motion to dismiss will establish as a matter of law whether Paolino has a right to advancement for the Counterclaims. Having rejected the legal arguments raised by Mace, I hold that he has that right.

I further address the scope of the advancement right in light of an argument made by Mace. In its briefing, Mace argued vigorously that I should deny advancement to Paolino because it was impossible to separate his litigation activities on his affirmative claims from his litigation activities on the Counterclaims. According to Mace, "the same common nucleus of operative fact—i.e. Paolino's performance or failure to perform under the employment agreement—underlies both the affirmative claims and the counterclaims." DOB 9. Mace also asserted that "because there is no difference between prosecuting the affirmative claims and defending the counterclaims, Paolino is not entitled to

advancement of any sum." DRB at 13. Mace concluded that "there is no objective basis for distinguishing between the costs of prosecuting the affirmative claims and defending the counterclaims." *Id.*

I will hold Mace to its representations regarding the nature of the claims in the Arbitration. Because Paolino has a right to advancement for the Counterclaims, and because Mace has represented to me that it is impossible to distinguish between expenses incurred in connection with the Counterclaims and expenses incurred on affirmative claims, I conclude that all of Paolino's reasonable expenses for the Arbitration must be advanced.

In making this ruling, I do not hold that Paolino has a right to advancement for the offensive claims he asserted in the Arbitration. He has not claimed such a right, and he clearly does not enjoy one under the plain language of the Bylaws. I am instead ruling on the scope of what expenses Paolino can seek under his advancement right for the Counterclaims. On that issue, Mace has made representations to the Court, and those representations have consequences.

## III. CONCLUSION

For the foregoing reasons, Mace's motion to dismiss is denied. Paolino has a legal right to advancement for expenses incurred in the Arbitration. Further proceedings are required to determine any amounts he is due pursuant to that right. If the parties cannot agree, this dispute shall proceed summarily with respect to those issues. The indemnification claim is stayed pending the outcome of the Arbitration. IT IS SO ORDERED.