## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TIMOTHY J. HARRIS, on behalf of himself and derivatively on behalf of Harris FRC Corporation and The Mary Ellen Harris 2011 Grantor Retained Annuity Trust, | ) ) ) ) ) ) |
| Petitioner/Plaintiff, | ) ) |
| and | ) ) |
| KRISTEN HARRIS and MEGAN LOEWENBERG, on behalf of themselves and derivatively on behalf of Harris FRC Corporation and The Mary Ellen Harris 2011 Grantor Retained Annuity Trust, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   C.A. No. 2019-0736-JTL |
| MARY ELLEN HARRIS, JUDITH LOLLI, CHARLES GRINNELL, ROYCE MANAGEMENT, INC., MICHAEL SCHWAGER and PAUL PETIGROW, | ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) |
| HARRIS FRC CORPORATION, a New Jersey Corporation, | ) ) ) |
| Respondent, | ) ) |
| and | ) |

|                                                    | )  |
| -------------------------------------------------- | -- |
| HARRIS FRC CORPORATION, a New                      | )  |
| Jersey Corporation and THE MARY                    | )  |
| ELLEN HARRIS 2011 GRANTOR                          | )  |
| RETAINED ANNUITY TRUST,                            | )  |
|                                                    | )  |
| Nominal Defendants.                                | )  |

**MEMORANDUM OPINION**

Date Submitted: November 9, 2022
Date Decided: January 6, 2023

Joel Friedlander, Christopher M. Foulds, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; *Counsel for Petitioner/Plaintiff Timothy J. Harris.*

S. Michael Sirkin, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington Delaware; Gregory Lomax, LAULETTA BIRNBAUM, LLC, Sewell, New Jersey; Jill Guldin, FISHER BROYLES, LLP, Princeton, New Jersey; *Counsel for Kristen C. Harris and Megan Loewenberg.*

David A. Jenkins, Julie M. O'Dell, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; *Counsel for Mary Ellen Harris.*

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; *Counsel for Mary Ellen Harris, Paul Petigrow, and Michael Schwager.*

Kurt M. Heyman, Patricia L. Enerio, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Royce Management, Inc., Judith Lolli, and Charles Grinnell.*

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Neal J. Levitsky, E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware; Emily A. Kaller, GREENBAUM, ROWE, SMITH & DAVIS LLP, Woodbridge, New Jersey; *Counsel for Harris FRC Corporation.*

William M. Kelleher, Phillip A. Giordano, Madeline Silverman, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Counsel for The Mary Ellen Harris 2011 Grantor Retained Annuity Trust.*

**LASTER, V.C.**

Harris FRC Corporation (the "Company") is a family-owned corporation. The plaintiffs are three of the five children of Dr. Robert M. Harris, Sr., and Mary Ellen Harris.[1] The plaintiffs allege that Mary Ellen and four of her close friends and advisors schemed to seize control of the Company in 2015 as Dr. Harris's health was failing. Mary Ellen and her advisors then engaged in a series of self-dealing transactions that tunneled millions of dollars out of the Company. They also used Company funds to perpetuate their control.

In 2019, after one of the plaintiffs started asking questions, the defendants caused the Company to merge into a newly formed New Jersey shell corporation (the "Outbound Merger"). The Outbound Merger deprived the plaintiffs of standing to seek books and records under Delaware law, but it opened up another route to information. One of the plaintiffs sought appraisal and used discovery in that action to access material previously sought in a books-and-records demand. With the benefit of that information, the plaintiffs have asserted plenary claims for breach of fiduciary duty against Mary Ellen, as well as claims for breach of fiduciary duty and for aiding and abetting breaches of fiduciary duty against the advisors. The amended complaint challenges the Outbound Merger, contending that it too was a breach of fiduciary duty and that the minority stockholders were not

---

[1] My standard practice is to identify individuals by their last name without honorifics. When individuals share the same last name, my standard practice is to shift to first names. Using first names is confusing because Dr. Robert M. Harris has a son with the same name. This decision therefore refers to the father as "Dr. Harris." That reference is sadly confusing as well, because one of the plaintiffs is Dr. Timothy J. Harris. This decision refers to him as "Tim Harris." The English language lacks a fitting collective noun for adult children; "children" remains technically accurate but implies minor status. This decision refers to the five adult children collectively as the "Siblings."

provided with all material information in connection with their decision to pursue or eschew appraisal.

Two of the advisors contend that the Outbound Merger deprived the plaintiffs of standing to assert any derivative claims relating to conduct that predated the effective time of that transaction. As a matter of judicially created common law, the continuous ownership rule requires that a plaintiff who asserts derivative claims maintain stockholder status throughout the litigation. Under controlling precedent, a stock-for-stock merger in which a stockholder's shares in the acquired corporation are converted into shares in the surviving corporation deprives the stockholder of the ongoing equity interest that is necessary to satisfy the rule. Invoking this rule, the moving defendants contend that any derivative claims that challenge matters that preceded the Outbound Merger must be dismissed. They claim that the plaintiffs cannot litigate—and the court cannot consider—any issues involving the dismissed claims.

The moving defendants are correct as to the plaintiffs' lack of standing to litigate derivative claims about pre-merger conduct, but not as to its implications for the case. The plaintiffs have asserted a direct claim challenging the Outbound Merger. Delaware law permits sell-side stockholders to challenge a merger directly for failing to afford value to derivative claims. When the extinguishment of derivative standing confers a unique benefit on the fiduciary that effectuated the merger, the fiduciary must prove that the merger was entirely fair, including that it provided stockholders with a fair share of the value of the derivative claims. The plaintiffs can continue to litigate the derivative claims, not as

derivative claims that can support relief in their own right, but as assets to be valued as part of the plaintiffs' challenge to the Outbound Merger.

The motion to dismiss the derivative claims about events pre-dating the Outbound Merger is granted. The granting of that motion and the resulting focus on the Outbound Merger has knock-on effects for other claims in the case. For present purposes, it warrants staying the plaintiffs' claims for breach of fiduciary duty and for aiding and abetting breaches of fiduciary duty that are based on conduct that took place after the Outbound Merger. If the plaintiffs prevail on their challenge to the Outbound Merger and are awarded the remedy of quasi-appraisal, then they will receive full value for their shares as of the effective date for the Outbound Merger (plus interest). The court would condition that relief on the plaintiffs tendering their shares to the Company, as they would do if they had pursued an appraisal for all of their shares. The effect of that relief would be that the plaintiffs no longer would have an equity interest in the Company that could support claims about post-merger conduct. The litigation as to post-merger claims is therefore stayed.

## I.   FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' Verified Supplemental and Third Amended Complaint (the "Complaint") and the documents that it incorporates by reference.[2] At this procedural stage, the plaintiffs are entitled to have the court credit their allegations and

---

[2] Citations in the form "Ex. __" refer to documents attached to the Affidavit of Christopher M. Foulds, which collects certain documents that are incorporated by reference in the complaint. Dkt. 467.

draw all reasonable inferences in their favor.

## A.      The Company

Before May 2016, the Company was a New Jersey corporation. From May 2016 until May 2019, the Company was a Delaware corporation. Since May 2019, the Company has been a New Jersey corporation. It is and always has been a family-held entity. Currently, its only stockholders are Mary Ellen, the five Siblings, and various trusts created for their benefit. The plaintiffs in this action are three of the Siblings: Tim Harris, Kristen Harris, and Megan Harris Loewenberg. As discussed below, another Sibling previously sued Mary Ellen and the Company and reached a settlement.

Dr. Harris founded the Company after securing the patent rights for an epilepsy drug. He monetized the patent rights through a license agreement with a global biopharmaceutical company and formed the Company to hold the rights and receive royalty payments. That revenue stream historically amounted to approximately $100 million per year. The Company's only significant function was to collect and distribute the payments. In 2020, the Company sold its patent rights for $342 million in cash. The Company currently holds a pool of cash of around $120 million. It has no operating business.

The Company has issued 1,000 shares. Originally, Dr. Harris and Mary Ellen owned the shares jointly as tenants by the entireties. In 2002, they transferred 38 shares to each of the Siblings, resulting in each owning a 3.8% interest. In 2011, Dr. Harris and Mary Ellen each created a grantor retained annuity trust (a "GRAT") and funded each GRAT with 245 shares. The GRATs had terms of seven years and would expire on December 31, 2018. At that point, the shares would be distributed to the Siblings, with each receiving an additional

4

49 shares. Through the combination of the 190 shares they received directly and the 490 shares distributed from the GRATs, the Siblings would receive a total of 680 shares. In total, the transactions would transfer a 68% interest in the Company from the parents to the Siblings.

**B.    Dr. Harris's Illness**

In October 2013, Dr. Harris was diagnosed with an aggressive form of aphasia consistent with Alzheimer's disease. After an MRI, two distinguished specialists at Columbia University confirmed the diagnosis.

As Dr. Harris's health deteriorated, Judith Lolli insinuated herself into Mary Ellen's financial life. Lolli and Mary Ellen are next-door neighbors in Holmdel, New Jersey. They also own adjacent beach houses in Point Pleasant, New Jersey. They are so close that Lolli appears to have spliced Mary Ellen Harris's cable connection and run a cable to her own home. Phone logs show that Mary Ellen and Lolli text many times a day.

Lolli brought Mary Ellen into contact with her own friends and advisors. Paul Petigrow is a New Jersey lawyer who served as Lolli's personal counsel. Petigrow promptly became Mary Ellen's personal counsel as well.

Charles Grinnell is a New Jersey lawyer and career prosecutor who investigated and prosecuted the gangland murder of Lolli's brother, then became her close friend. Michael Schwager is Lilli's personal accountant and another close friend. Like the Complaint, this decision refers to Lolli, Petigrow, Grinnell, and Schwager collectively as the "Advisors."

## C.     The Takeover

With Dr. Harris's health declining, questions arose as to who would lead the Company. Mary Ellen had no experience or qualifications for the role. The eldest Sibling, Robert M. Harris, Jr., had worked at the Company since 2000, held the office of Vice President, and managed the relationship that generated the Company's royalty stream.

A power struggle ensued with Mary Ellen and the Advisors on the one side and Robert on the other. In April 2015, eighteen months after his Alzheimer's diagnosis, Dr. Harris purportedly acted by written consent to remove Robert from his position as an officer.[3] The written consent added Mary Ellen to the board of directors (the "Board"), where Dr. Harris had been the sole director. The plaintiffs assert that Dr. Harris did not have the capacity to execute the written consent and that Lolli pulled the strings so that Mary Ellen gained control over the Company.

Immediately after the first consent, Dr. Harris and Mary Ellen executed a second consent that caused the Company to enter into "an agreement with Lolli in substantially the form submitted hereto." Compl. ¶ 32. The consent did not attach an agreement. In June 2015, Lolli and Mary Ellen executed an employment agreement which provided for Lolli's compensation to be determined at an unspecified future date. The Company began providing Lolli with benefits and paying her $15,000 as an employee. The Company retained Grinnell as a consultant at a rate of $110 per hour. Petigrow began doing legal

---

[3] The Complaint alleges that Robert also signed a letter of resignation. In any event, he was out.

work for the Company. Schwager took over as the Company's accountant. The Advisors had gotten their noses inside the tent.

In the second half of 2015, Lolli and Grinnell formed Royce Management, Inc. ("Royce") as a vehicle for providing management services to the Company. In October, the Company began paying Royce $208,000 a month or $2,496,000 per year. The Company and Royce subsequently entered into a management services agreement that paid Royce $208,334 per month, or $2,500,128 per year. The agreement renewed automatically every year and provided for an annual fee escalator of 3.5%. The Company and Royce have amended the management services agreement twice, each time making it more favorable to Royce. In addition to the monthly fee, Mary Ellen has approved large end of year bonuses for Royce. In total, Royce received over $20 million from the Company between October 2015 and December 2020.

Royce is a shell. It has no employees other than Lolli and Grinnell, and it has no other clients. It has no assets other than its contract with the Company. It operates out of the Company's offices. It exists solely to channel money to Lolli and Grinnell. It has no expenses other than their salaries, pension contributions, distributions, and two $1,000 per month luxury car leases.

## D. Dr. Harris's GRAT

To maintain control over the Company, Mary Ellen and the Advisors had to deal with the GRATs. If the GRATs distributed 480 shares to the Siblings, then control over the Company would pass to them.

7

Around the same time that the Company began paying Royce, Lolli served as a witness when Dr. Harris purportedly amended his GRAT and executed a codicil to his will. Petigrow oversaw the drafting of the documents. The principal consequence of the amendments was to redirect the 290 shares in Dr. Harris's GRAT from the Siblings to Dr. Harris's marital trust. That trust benefits Mary Ellen, and she has a power of appointment over its corpus, enabling her to determine where the assets go when the GRAT terminates. The transaction reduced the number of Shares that the Siblings would receive from 680 to 435, below majority control. The amendments to Dr. Harris's GRAT and the codicil to his will are not at issue in this litigation, but they provide important context.

The Advisors wanted a cooperative trustee to oversee Dr. Harris's GRAT and the marital trust, so Lolli and Grinnell turned to Dan Selcow, a wealth manager at First Republic Bank who was also a friend of Petigrow and Schwager. After they brought some of the Harris's personal accounts to Selcow to manage, Selcow arranged for First Republic Trust Company of Delaware LLC ("First Republic Delaware") to take over as trustee.

E.      **The Idea For The Inbound Merger**

It was readily apparent that Robert might bring litigation over his removal and the events at the Company. New Jersey recognizes a claim for minority stockholder oppression, and available remedies include orders dissolving the corporation or appointing a custodian or provisional directors. A stockholder oppression lawsuit thus threatened to deprive Mary Ellen and the Advisors of control.

Mary Ellen and the Advisors believed that Delaware law would be more protective of their activities, so they started working on a merger that would move the Company to

8

Delaware (the "Inbound Merger"). As Mary Ellen colorfully put it, "I have to work out a billion things at the office to get things ready for Delaware. They have better laws regarding shit like bob is pulling and we have connections there." Ex. 1.

In November 2015, Petigrow drafted Dr. Harris's letter of resignation from the Board. Dr. Harris purportedly signed it on November 16, two years after his Alzheimer's diagnosis. His resignation left Mary Ellen as the sole director. Petigrow drafted a power of attorney in which Dr. Harris empowered Mary Ellen to act on his behalf. Dr. Harris purportedly signed it, and Lolli witnessed it. Petigrow also drafted two proxies that Mary Ellen could use to vote Dr. Harris's shares, one for Dr. Harris to sign and one for Mary Ellen to sign using her power of attorney.

In December 2015, Mary Ellen provided an initial set of approvals for the Inbound Merger. She also appointed herself President and began paying herself $5 million per year for serving in that role. She continued the payments until 2019, when she resigned after the filing of this litigation. She appointed a lawyer to succeed her and paid him 11.5% of what she paid herself.

On December 7, 2015, Petigrow and Mary Ellen formed a Delaware corporation to use in the Inbound Merger. Two weeks later, Robert had his attorney send a letter to the Company that formally threatened litigation.

F.     **Value Extraction On A Larger Scale**

In 2016, Mary Ellen and the Advisors stepped up their extraction of value from the Company. In February 2016, Mary Ellen signed a written consent approving an employment agreement with Petigrow. It paid him $600,000 per year to serve as Vice

9

President and General Counsel for the Company. Petigrow continued to run a solo law practice out of the Company's offices, using the Company's personnel and resources, and without paying rent. Given his full-time law practice, Petigrow worked only part-time and sporadically as General Counsel.

In March 2016, Lolli had a physician friend declare Dr. Harris incapacitated. That same month, Mary Ellen adopted a resolution in her capacity as sole director that paid Dr. Harris a bonus in the amount of $15 million. In light of Dr. Harris's incapacitation, the $15 million bonus was a disguised distribution to Mary Ellen.

Schwager cashed in too. Because of the Company's minimal operations, the services it required for its accounting and taxes should have cost $20,000 to $30,000 per year. The Company paid Schwager simultaneously on two parallel schedules: (i) $12,500 a month for a total of $150,000 per year, and (ii) $25,000 quarterly for another $100,000 per year. He also received annual "Merry Christmas" bonuses of $35,000. Schwager thus raked in $285,000 per year, ten times what the Company should have been paying.

On May 1, 2016, the Inbound Merger became effective, and the Company emerged as a Delaware corporation. Robert exercised dissenters' rights and pursued an appraisal proceeding in New Jersey state court. He also filed plenary litigation. He later settled for a payment of $20 million from the Company.

Now firmly in control, and believing they had greater protection under Delaware law, Mary Ellen and the Advisors used Company funds to pay for an array of personal expenses. On the Company's taxes, Schwager deducted the expenses as if they were business related.

10

In April 2017, Dr. Harris died. The shares in his GRAT that would have gone to the Siblings passed to the marital trust.

## G. Tim Harris Hires Counsel And Asks Questions.

The Siblings had become concerned about what Mary Ellen and the Advisors were doing. In March 2019, the Company informed the Siblings that its majority stockholder had acted by written consent in lieu of an annual meeting, so no annual meeting would be held. Tim Harris objected and told Grinnell that an annual meeting was required under Delaware law. The Company reversed course and noticed an annual meeting.

On April 10, 2019, Tim Harris's counsel in this action attended the annual meeting as his proxy. Petigrow and Grinnell attended for the Company. Mary Ellen did not attend. Petigrow chaired the meeting. Grinnell refused to identify himself. Petigrow called for a vote for the election of Mary Ellen as the Company's sole director and exercised proxies from Mary Ellen and First Republic Delaware in favor of her election. The proxies represented a majority of the Company's voting power. After tallying the vote, he called the meeting to a close.

Before the meeting was adjourned, Tim Harris's counsel asked for a report on the business of the Company, then followed up with a series of specific questions. Petigrow and Grinnell failed to provide substantive answers on numerous topics. Grinnell repeatedly asserted that all stockholder questions needed to be put in writing.

## H. The Outbound Merger

With Tim Harris having retained a Delaware lawyer who had started asking questions, it did not take a Tiresias to foresee that a books-and-records demand could be

11

coming soon, or that litigation might follow. Within a week after the annual meeting, the Advisors started working on a plan to move the Company out of Delaware and back into New Jersey (the "Outbound Merger"). Grinnell circulated a New Jersey Supreme Court decision which indicated that under New Jersey law, inspection rights could be limited to formal documents like financial statements, minutes, and a list of stockholders. The Company did not keep meetings, and Schwager prepared the Company's financial statements so that they did not reveal the many self-interested transactions or the payments to Royce. The Outbound Merger thus could be used to prevent Tim Harris from obtaining information about what was going on at the Company. The Advisors also thought that the Outbound Merger would cut off the Siblings' standing to assert derivative claims regarding events predating the merger, as they have argued in this case. It therefore seemed that they could move the Company back to New Jersey without walking into the type of lawsuit for stockholder oppression that they originally moved to Delaware to evade. And if someone eventually threatened such a lawsuit, they could always move the Company again.

On May 6, 2019, Tim Harris sent the Company a written demand for documents under Section 220. On May 13, the Company refused to produce any documents, claiming the demand constituted "harassment." Compl. ¶ 127.

The Outbound Merger became effective on May 17, 2019. Mary Ellen approved the Outbound Merger as a director, and Mary Ellen and First Republic Delaware executed written consents approving it as stockholders.

The notice disseminated in connection with the Outbound Merger provided scant information. It offered only the following justification:

12

> The Delaware Reincorporation was effected with the intent of capturing certain efficiencies that were deemed at the time to be in the best interest of the predecessor company and its stockholders. The board of directors of Harris Delaware has determined that the circumstances giving rise to such potential efficiencies are no longer present. . . . Harris Delaware's board of directors has determined that it is advisable for Harris Delaware's internal affairs to be governed by New Jersey law.

*Id.* ¶ 131. The notice did not discuss the effect on stockholder inspection rights or derivative claims. It did not include any information about the large payments going to Royce and to Schwager, the plentitude of personal expenses being paid for by the Company, or the numerous entities being run out of the Company's offices. The financial statements attached to the notice obscured those payments.

After the Outbound Merger, Mary Ellen and the Advisors caused the Company to break with a decade-long practice of making quarterly distributions, even though the Company was an S Corporation and so the stockholders had to pay taxes on imputed income. Mary Ellen has admitted that the change was made so that the Siblings would not have funds to pay their attorneys. The change did not affect Mary Ellen, who was having the Company pay for her counsel while paying herself $5 million per year.

## I. This Litigation

The Outbound Merger stymied Tim Harris's attempt to use Section 220, but it opened up another informational avenue. Tim Harris sought appraisal for one share of Company common stock. In discovery, he sought the information that a books-and-records inspection would have generated. Discovery did not go smoothly, and the court has expended significant judicial resources addressing various discovery motions. After

13

considerable effort, Tim Harris and his counsel were able to obtain some of the information they had requested.

In September 2021, Tim Harris filed an amended petition and complaint that added plenary claims for breach of fiduciary duty against Mary Ellen and claims for breach of fiduciary duty and aiding and abetting against the Advisors.

In October 2021, Kristen Harris and Megan Harris Loewenberg joined the case as additional plaintiffs. That same month, Mary Ellen and the Advisors recruited Robert Pincus, a respected Delaware lawyer, to join the Board and serve as a one-person special litigation committee (the "SLC"). The plaintiffs stood down to permit the SLC to investigate. The plaintiffs also agreed to mediate with the SLC.

On December 29, 2021, while the SLC's counsel was on vacation, the Company filed an answer. The answer included numerous denials of factual allegations; claimed that demand was required, even though the SLC had already been formed; and alleged that Tim Harris brought the Delaware action in bad faith. The decision whether to file an answer fell within the SLC's authority, yet the Company filed the answer without informing the SLC or seeking the SLC's approval.

On January 21, 2022, Pincus resigned from the Board, disbanded the SLC, and expressly took no position on the plaintiffs' claims.

## J.    The Currently Operative Complaint

In March 2022, the plaintiffs filed the Complaint. From a big picture standpoint, the Complaint asserts derivative claims for breach of fiduciary duty and for aiding and abetting breaches of fiduciary duty based on acts of self-dealing by Mary Ellen, payments to the

14

Advisors, and misuse of Company resources. The Complaint also asserts direct claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty based on the Outbound Merger, and Tim Harris seeks appraisal.

Count I of the Complaint asserts that Mary Ellen has breached her fiduciary duties as President, sole director, and controlling stockholder of the Company. The Complaint groups the breaches into six broad categories:

- approving self-interested and unfair compensation and other personal payments to herself;

- using Company resources for personal gain, including by supporting her personal ventures and engaging in transactions to maintain her control;

- colluding with the Advisors by providing them with exorbitant compensation and benefits to pay them off for helping her engage in and cover up wrongdoing at the Company;

- sequestering distributions to oppress stockholders;

- engaging in the Outbound Merger; and

- verifying knowingly incomplete and misleading discovery responses.

Skipping for the moment over Count II, Count III asserts claims for breach of fiduciary duty against the Advisors in their capacity as officers and agents. The Complaint alleges that Petigrow is a *de jure* officer, having agreed to serve as General Counsel. The Complaint alleges that Grinnell, Lolli, and Schwager acted as *de facto* officers. The Complaint alleges in the alternative that all were senior managers and agents of the Company who owed fiduciary duties in those capacities. The substance of the claims against the Advisors generally tracks the claims against Mary Ellen.

15

Count IV alleges in the alternative that to the extent the Advisors are not accountable for breaching their own duties as fiduciaries of the Company, both they and Royce have aided and abetted the breaches of fiduciary duty by Mary Ellen, Petigrow, and any other Advisor that is found to have owed fiduciary duties.

Counts II and V challenge a transaction between Mary Ellen and her GRAT. Count VI is the claim for an appraisal. Those counts are not at issue in this decision.

Mary Ellen has not moved to dismiss the Complaint on any grounds. Petigrow does not argue that Count III fails to state claims against him, nor does he maintain that this court cannot exercise personal jurisdiction over him for purposes of that claim. Otherwise, the Advisors have advanced a multitude of arguments.

- Petigrow and Schwager maintain that the plaintiffs cannot assert derivative claims on behalf of the Company because the Outbound Merger deprived them of standing. That argument, if correct, would require the dismissal without prejudice of Counts I, III, and IV to the extent those counts assert derivative claims, as they predominantly do.

- Petigrow, Schwager, Lolli, Grinnell, and Royce ask the court to rely on *forum non conveniens* to dismiss this action in deference to actions pending in New Jersey. That argument, if correct, would require the dismissal without prejudice of the entire action.

- Lolli, Grinnell, Royce, and Schwager insist that this court cannot exercise personal jurisdiction over them. That argument, if correct, would require the dismissal without prejudice of all claims against those defendants.

- Petigrow argues that this court cannot exercise personal jurisdiction over him for purposes of Count V. That argument, if correct, would require the dismissal without prejudice of that count as to him.

- Lolli, Grinnell, and Royce argue that this court is an improper venue because the management services agreement between the Company and Royce contains a forum selection clause specifying the courts of New Jersey. That argument, if correct,

16

would require the dismissal without prejudice of a subset of the claims asserted in Counts III and IV.

- Schwager insists that he was never a fiduciary of the Company and that Count III does not state a claim against him. That argument, if correct, would require the dismissal with prejudice of Count III as to him.

- Petigrow and Schwager argue that Count IV does not state a claim against them. That argument, if correct, would require the dismissal with prejudice of that count as to them.

- Lolli, Grinnell, Petigrow, and Schwager contend that Count V does not state a claim against them. That argument, if correct, would require the dismissal with prejudice of Count V.

That is a barrage of arguments.

## II.     LEGAL ANALYSIS

Petigrow and Schwager contend that as a result of the Outbound Merger, the plaintiffs lost standing to assert any derivative claims based on conduct pre-dating the effective time. They conclude that the court must dismiss the derivative claims that the plaintiffs have asserted in this action. They contend that if the plaintiffs wish to assert any derivative claims, they must do so on behalf of the Company in its current manifestation as a New Jersey corporation. As they envision it, all of the issues raised in Counts I, III, and IV vanish from the case.

The moving defendants are correct that the plaintiffs lost standing to litigate derivative claims based on conduct pre-dating the effective time, but they are incorrect about the effect on the case. The plaintiffs have asserted a direct claim challenging the Outbound Merger, which they maintain was the product of breaches of fiduciary duty by Mary Ellen and the Advisors and, as to any Advisors who were not fiduciaries, conduct

17

constituting aiding and abetting breaches of fiduciary duty. As part of that direct claim., they contend that the Outbound Merger failed to afford them fair value for the derivative claims. The parties will continue to litigate that claim. This decision stays any claims based on conduct post-dating the Outbound Merger.

## A. The Continuous Ownership Rule And The Implications Of A Loss Of Standing To Assert Derivative Claims

In *Lewis v. Anderson*, the Delaware Supreme Court created the continuous ownership rule by stating expansively that "a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at [the] time of commencement of suit but that he must also maintain shareholder status throughout the litigation." 477 A.2d 1040, 1046 (Del. 1984). Later in the decision, the high court restated the rule as follows: "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Id.* at 1049. Framing the rule for purposes of a reverse triangular merger in which the stockholder plaintiffs had their shares converted into shares of the acquiring company, the Delaware Supreme Court held that "a corporate merger destroys derivative standing of former shareholders of the merged corporation from instituting or pursuing derivative claims" that were the property of the acquired company. *Id.* at 1047. On the specific facts of the case, the high court stated pointedly that "plaintiff lost standing to pursue Old Conoco's derivative claim when he ceased to be a shareholder of Old Conoco and that his underlying claim thereby became the exclusive property right of New Conoco . . . ." *Id.* at 1042. Since *Lewis v. Anderson*, the Delaware Supreme Court has repeatedly reaffirmed both the continuous ownership rule

and its implications for derivative claims. *See, e.g.*, *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016) (reaffirming rule and extending it to limited partnerships); *Ark. Tchr. Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. 2013) (reaffirming rule); *Lewis v. Ward*, 852 A.2d 896, 904 (Del. 2004) (same).

Invoking the continuous ownership rule, the moving defendants contend that the Outbound Merger extinguished the plaintiffs' standing to sue derivatively on behalf of the pre-merger Delaware entity and that if the plaintiffs wish to assert derivative claims, they must sue anew on behalf of the surviving New Jersey entity. That innocently presented argument sets up a kill shot in the form of the contemporaneous ownership requirement, which requires that a stockholder who seeks to sue derivatively must own shares at the time of the wrong. *See* 8 *Del. C.* § 327; N.J. Ct. R. 4:32-3; *Seidman v. Clifton Sav. Bank, S.L.A.*, 2009 WL 2513797, at *14 (N.J. Super. Ct. App. Div. Aug. 19, 2009), *aff'd*, 14 A.3d 36 (N.J. 2011). Once the plaintiffs file suit on behalf of the surviving New Jersey corporation, the defendants can argue that they were not stockholders of that entity at the time of the pre-merger wrongs. The moving defendants have deployed careful language to preserve this argument. They say that the Outbound Merger "did not extinguish any pending derivative claims and Plaintiffs can still bring derivative claims in their capacity as shareholders in the surviving entity, if compliant with New Jersey law." Dkt. 473 at 6. Compliance with New Jersey law implies compliance with New Jersey's version of the contemporaneous ownership requirement.

Delaware law offers two answers to the one-two punch that the continuous ownership rule and the contemporaneous ownership requirement present for sell-side

19

stockholders. The first answer is a pair of exceptions to the continuous ownership rule. *See Anderson*, 477 A.2d at 1046 n.10. One applies when the transaction that otherwise would deprive the plaintiffs of standing "is essentially a reorganization that does not affect the plaintiff's relative ownership in the post-merger enterprise." *Countrywide*, 75 A.3d at 894; *accord Ward*, 852 A.2d at 904; *see Schreiber v. Carney*, 447 A.2d 17, 22 (Del. Ch. 1982). The other applies when a plaintiff loses standing based on a merger "perpetrated merely to deprive shareholders of their standing to bring or maintain a derivative action." *Countrywide*, 75 A.3d at 894. When those exceptions apply, the plaintiffs can continue litigating their derivative claims as derivative claims, and the case proceeds as if the merger never happened. I will call this the "Derivative Claim Route."

The second answer recognizes that the extinguishment of derivative standing can confer a unique benefit on the fiduciaries that approved the merger, thereby subjecting the merger to a direct challenge. Chancellor Allen blazed the trail in *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757 (Del. Ch. 1986), where a controlling stockholder effectuated a merger for the primary purpose of eliminating the minority stockholders' ability to maintain a derivative claim. *Id.* at 763. A derivative action was pending in New Jersey state court, and the New Jersey judge dismissed that action for lack of standing. Chancellor Allen rejected the argument that derivative standing could be eliminated without consequence, and he required that the controlling stockholder establish the fairness of the merger price, including the value of the derivative claims. *Id.* at 766. He explained that in the remedial phase, "those derivative claims may still be litigated; now, however, by reason of the

20

merger they will not be evaluated as derivative claims but rather, indirectly, as evidence relevant to the fairness of the cash-out price." *Id.*

In the years since *Colonial Foods*, both the Delaware Supreme Court and this court have recognized that a stockholder whose standing to sue derivatively was extinguished by merger can assert a direct claim challenging the fairness of the merger.[4] In *Parnes*, the Delaware Supreme Court explained that "[a] stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated." 722 A.2d at 1245. In *El Paso*, the Delaware Supreme Court pointed out that "equity holders confronted by a merger in which derivative claims will pass to the buyer have the right to challenge the merger itself as a breach of the duties they are owed." 152 A.3d at 1251. I will call this the "Direct Claim Route."

---

[4] *See, e.g.*, *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 138–39 (Del. 2021) (reversing dismissal of action challenging merger for failure to value litigation asset belonging to entity); *El Paso*, 152 A.3d at 1251–52 (holding that "equity holders confronted by a merger in which derivative claims will pass to the buyer have the right to challenge the merger itself as a breach of the duties they are owed"); *Parnes v. Bally Ent. Corp.*, 722 A.2d 1243, 1244–46 (Del. 1999) (permitting direct challenge to merger where CEO extracted side payments in connection with transaction); *In re Primedia, Inc. S'holder Litig.*, 67 A.3d 455, 477–90 (Del. Ch. 2013) (denying motion to dismiss secondary challenge to merger based on extinction of standing to litigate pending derivative claim); *In re Massey Energy Co.*, 2011 WL 2176479, at *2–4 (Del. Ch. May 31, 2011) (recognizing potential for secondary action in which plaintiffs challenged merger because it would extinguish their standing to litigate pending derivative claim; denying preliminary injunction to enjoin transaction).

**B.      The Availability Of Both Paths For Claims Based On Pre-Merger Conduct**

In this case, both the Derivative Claim Route and the Direct Claim Route are available. The question is which should apply. The plaintiffs argued both, but at oral argument, they stressed the Direct Claim Route. The defendants contend that neither route is available and that the plaintiffs only recourse is to sue anew on behalf of the surviving corporation, with whatever consequences that might have.

The Derivative Claim Route is available because the court could apply either of the exceptions to the continuous ownership rule. The court could apply the reorganization exception because the Outbound Merger can be regarded as the epitome of a corporate reshuffling. The only parties to the Outbound Merger were the Company in its incarnation as a Delaware entity and a newly formed New Jersey corporation. Before the Outbound Merger, the New Jersey corporation was a shell without any assets or operating business. Through the Outbound Merger, the Company merged into the New Jersey corporation. After the Outbound Merger, the surviving entity held only the assets that the Company brought to the transaction. Each share of stock in the Delaware entity was converted on a one-for-one basis into a share of stock in the New Jersey entity. There was no change in the entity other than the change in domicile from Delaware to New Jersey and, going forward, the application of New Jersey law to its internal affairs. As to matters that occurred while the Company was a Delaware corporation, Delaware law continues to govern.

The court also could apply the fraud exception. The Complaint's allegations support an inference that Mary Ellen and the Advisors implemented the Outbound Merger in an effort to deprive the Siblings of their ability to seek books and records and to pursue

22

derivative claims. Mary Ellen and the Advisors started planning the Outbound Merger immediately after Tim Harris's counsel appeared at the 2019 annual meeting of stockholders and asked questions. The following week, the Advisors began communicating about a potential merger, and Grinnell circulated a New Jersey Supreme Court decision on the scope of access to books and records under New Jersey law. Within a month, the Outbound Merger had closed. No one has offered any reason for engaging in the Outbound Merger other than to affect Tim Harris's ability to seek books and records and to pursue derivative claims.

Both paths of the Derivative Claim Route are therefore open. And the court could just as easily follow the Direct Claim Route. In *Morris*, the Delaware Supreme Court adopted a pleading-stage framework that this court used in the *Primedia* decision to evaluate whether a plaintiff had standing to challenge a merger based on the extinguishment of derivative standing. 246 A.3d at 136 ("When the court is faced with a post-merger claim challenging the fairness of a merger based on the defendant's failure to secure value for derivative claims, we think that the *Primedia* framework provides a reasonable basis to conduct a pleadings-based analysis to evaluate standing on a motion to dismiss."). The *Primedia* decision described the framework as follows:

> A plaintiff claiming standing to challenge a merger directly under *Parnes* because of a board's alleged failure to obtain value for an underlying derivative claim must meet a three part test. First, the plaintiff must plead an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted. Second, the value of the derivative claim must be material in the context of the merger. Third, the complaint challenging the merger must support a pleadings-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it.

67 A.3d at 477.

In this case, the plaintiffs can meet all of the *Primedia* requirements. The first *Primedia* element is met because the plaintiffs have plead derivative claims that would surviving a Rule 12(b)(6) motion to dismiss. Mary Ellen has not argued that Count I fails to state a claim against her for breach of fiduciary duty. Petigrow, Lolli, and Grinnell have not argued that Count III fails to state a claim against them for breach of fiduciary duty.[5] Schwager has argued that Count III fails to state a claim against him for breach of fiduciary duty, and Petigrow and Schwager have argued that Count IV fails to state a claim against them for aiding and abetting breaches of fiduciary duty, but it is fair to say that those counts state viable, pleading-stage claims.

The second *Primedia* element is met because it is reasonably conceivable that the value of the derivative claims was material in the context of the Outbound Merger. There is no bright line figure for materiality. *Goldstein v. Denner*, 2022 WL 1797224, at *11 (Del. Ch. June 2, 2022). One place to look for pleading-stage guidance is the magnitude of the baskets that parties agree to when a seller provides a buyer with deal-related indemnification, because the size of those limits indicates the magnitude of loss that a buyer is willing to swallow before it can assert a claim to recover. The second *Primedia* element asks the same basic question: How much loss must sell-side stockholders swallow before

---

[5] Based on a jurisdictional argument they make, Lolli and Grinnell implicitly contend that they were never officers and cannot be sued for breach of duty in that capacity, but they have not made a Rule 12(b)(6) motion, and they do not contest that they owed fiduciary duties as senior managerial personnel and as agents.

gaining standing to assert a claim to recover that value. Studies of basket amounts suggest a rule of thumb of 0.5% to 1%.[6]

The Outbound Merger did not imply a transaction price, but in 2020, one year after the Outbound Merger, the Company sold its sole asset for $342 million in an arm's-length transaction. For an entity with an operating business, valuation can change significantly over the course of a year, but the Company simply receives and distributes cash. Other information in the record suggests a discount rate for the Company of 13%. Applying that

---

[6] The 2021 Private Deal Study prepared by the Mergers & Acquisitions Committee of the American Bar Association examined 123 private deals valued at between $30 million and $750 million, consistent with the size and private status of the Company. The vast majority of deals have baskets of 1% of transaction value or less, a figure consistent with prior studies dating back to 2004. The median in 2021 for deals without representations and warranty insurance was 0.5%. The median deductible in 2021 for deals without representations and warranty insurance was 0.5%. Other authorities point to standard ranges below 1%. *See* Eric Rauch & Brian Burke, *The Impact of Transaction Size on Highly Negotiated M&A Deal Points*, 71 Bus. Law. 835, 838–39 (2016) ("The average threshold amount of a liability basket in our study was 0.83 percent of the transaction size, decreasing slightly as the purchase price increased."); Ana Sofia Batista, Carl-Olof E. Bouveng, Wayne D. Gray, Abhijit Joshi, Gregory E. Ostling & Ronaldo C. Veirano, *Private Mergers and Acquisitions--Global Trends in Buyer Protection*, Int'l L. Practicum, at 59, 67 (Spring 2013) ("Of the deals that included baskets, 47% and 41% of the deals analyzed in the U.S. Study had baskets that were between 0.5% and 1% of the transaction value and less than 0.5%, respectively. Twelve per cent of the deals included a basket that was between 1% and 2% of the transaction value."); Michael Glassner, *M&A terms: negotiating economic uncertainty with baskets and caps*, Westlaw Mergers & Acqs. Daily Briefing, Oct. 26, 2012, at 2014 WL 43689 ("Basket amounts are typically set between 0.5 to 1 percent of the transaction value."); Stephen Glover, *Indemnification Provisions: Standard Practice Revisited*, 5 No. 9 M & A Law. 1 (Mar. 2002) (noting that for 2001 sample, "[t]he smallest basket was 0.1% of the purchase price, the largest basket was 2.9% of the purchase price and the average basket was 1.0%").

discount rate suggests a rough estimate for the Company's value of $297 million at the time of the Outbound Merger.

Based solely on the Complaint, and without placing any value on the personal expenses that plaintiffs claim the Company paid or the cost of supporting other entities that the plaintiffs claim the Company incurred, the plaintiffs' damages claims for Counts I, III, and IV amount to approximately $63.54 million, or 21% of the Company's value.[7] Adding personal expenses and other costs would increase the numerator, as would accounting for the time-value of money through interest. The 21% figure is thus likely to be conservative. Assuming that the outcome on liability is a 50-50 proposition, the damages still exceed 10%. Assuming the defendants were entitled to 50% of the amounts they extracted as fair compensation, the damages still exceed 5%. It is reasonable to infer that the amount of the derivative claims is material.

---

[7] The rough breakdown is as follows:

| | |
|---|---|
| Bonus to Dr. Harris in same month he was declared incompetent | $15 million |
| Compensation to Mary Ellen as President | $25 million |
| Compensation to Lolli and Grinnell through Royce | $20 million |
| Compensation to Petigrow | $2.4 million |
| Compensation to Schwager | $1.14 million |
| Total: | $63.54 million |

Moreover, given that the Outbound Merger appears not to have resulted from a fair process, the plaintiffs need not meet a materiality threshold for purposes of the second *Primedia* element. In *Parnes*, the Delaware Supreme Court did not hold that a stockholder only could assert a direct claim challenging a merger by pleading facts indicating that the value of the diverted proceeds were so large as to render the price unfair. The Delaware Supreme Court instead recognized more broadly that a stockholder could assert a direct claim challenging a merger if the facts giving rise to what otherwise would constitute a derivative claim led *either* to the price *or* to the process being unfair.[8] In *Primedia*, the court identified this dimension of *Parnes* and explained that "[t]here is a strong argument that under *Parnes*, standing would exist if the complaint challenging the merger contained adequate allegations to support a pleadings-stage inference that the merger resulted from an unfair process due at least in part to improper treatment of the derivative claim." *Primedia*, 67 A.3d at 482 n.5. The *Primedia* decision did not explore that aspect of *Parnes* because the value of the derivative claim in that case was so clearly material. *Id.* More recently, this court noted that "[t]he weight of Delaware authority has interpreted *Parnes* as recognizing that a stockholder can assert a direct claim challenging a merger based on

---

[8] *See Parnes*, 722 A.2d at 1245 (explaining that *Kramer v. Western Pacific Industries* 546 A.2d 348 (Del. 1988), did not support a direct claim because "[t]he complaint did not question the fairness of the price offered in the merger *or* the manner in which the merger agreement was negotiated," and "did not allege that the merger price was unfair *or* that the merger was obtained through unfair dealing" (emphasis added); *id.* (holding that in order to state a direct claim, a stockholder must allege facts supporting an "unfair dealing and/or unfair price").

process challenges alone." *Goldstein*, 2022 WL 1797224, at \*12 (collecting authorities). The court held that "standing exists to assert a direct claim when a plaintiff alleges breaches of fiduciary duty that resulted in either an unfair price *or* an unfair process." *Id.*

In this case, there was zero process. The Advisors started planning the Outbound Merger immediately after Tim Harris's counsel appeared and asked questions at the 2019 annual meeting. Within a month, Mary Ellen had implemented the transaction unilaterally. In *Colonial Foods*, which also involved a unilaterally implemented merger, Chancellor Allen granted summary judgment as to liability in favor of the plaintiffs, finding that the merger "constituted a breach of the defendants' duty of fair dealing" where it was effectuated with the primary purpose of extinguishing the minority stockholders' standing to assert derivative claims and without any mechanisms that provided assurance that the derivative claims were assessed fairly. 505 A.2d at 765–66. The facts of this case suggest a similar outcome. The plaintiffs therefore can satisfy the second element of the *Primedia* test irrespective of the materiality of the derivative claims.

Finally, the third element of the test is met because the pleading-stage record supports an inference that Mary Ellen and the Advisors would never assert the underlying derivative claims. Those claims seek to recover compensation and benefits paid to Mary Ellen and the Advisors, making them interested in the litigation. Moreover, during the SLC's cameo appearance, the Company filed an answer that rejected the plaintiffs' claims and contended they had been filed for the purpose of harassment, despite the fact that assessing the derivative claims and deciding whether to answer fell within the SLC's authority. Add in the manner in which the Company has fought discovery, and the record

28

powerfully supports the inference that Mary Ellen would never cause the successor New Jersey entity to assert the derivative claims. The Direct Claim Route is thus an available course for this case.

## C.     The Choice Between Two Routes

The choice between the Derivative Claim Route and the Direct Claim Route presents an issue of case management. The court's overarching goal is to provide a fair and efficient forum for resolving disputes. Court of Chancery Rule 1 embodies that goal by instructing that the rules "shall be construed, administered, and employed by the Court and the parties, to secure the just, speedy and inexpensive determination of every proceeding." Ct. Ch. R. 1. Commenting on the sibling federal rule, a leading treatise states that "[t]here probably is no provision in the federal rules that is more important than this mandate. It reflects the spirit in which the rules were conceived and written, and in which they should be interpreted." 4 Charles Alan Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice & Procedure* § 1029 (4th ed.), Westlaw (database updated Apr. 2022). The Direct Claim Route best implements these goals.

Both routes have advantages and disadvantages. The principal advantage of applying an exception to the continuous ownership rule and proceeding along the Derivative Claim Route is that the plaintiffs will continue litigating their derivative claims as derivative claims. Counts I, III, and IV assert a mix of derivative and direct claims. The allegations of the Complaint for self-dealing, excessive compensation and benefits, and the misuse of Company resources are traditional derivative claims. The Company treated them

29

as derivative claims by appointing the briefly tenured SLC. In that sense, the Derivative Claim Route would continue the status quo.

The principal disadvantage of the Derivative Claim Route is to maintain an unnecessary level of case complexity. In addition to advancing the derivative claims in Counts I, III, and IV, the plaintiffs have asserted a direct challenge to the Outbound Merger for which they seek a remedy of quasi-appraisal. The Complaint easily pleads a claim for breach of the duty of disclosure, so the prospect of a quasi-appraisal remedy is a meaningful one. As the plaintiffs point out, to value the Company for purposes of the quasi-appraisal remedy, the court will need to include the value of the derivative claims. Thus, the plaintiffs currently are litigating the derivative claims both as claims that support relief in their own right and as assets to be valued in connection with the Outbound Merger. The two tracks create complexity for the parties and the court, because at each stage of the case, the parties and the court must consider both manifestations of the plaintiffs' claims.

Following the Direct Claim Route simplifies the case. The plaintiffs only will be litigating on the Direct Claim Route, and the parties and the court only will have to consider that framework. The Direct Claim Route also may promote settlement, because it involves investor-level relief. That type of relief is generally more attractive to plaintiffs because it puts cash in the investors' pockets, rather than routing a recovery through the corporation (where the proverbial foxes remain in charge of the henhouse). *See Baker v. Sadiq*, 2016 WL 4375250, at *2–3 (Del. Ch. Aug. 16, 2016). An investor-level remedy also can be more attractive to the defendants, because they need only come out of pocket for the investors' share of the damages, rather than the full amount of the corporate harm. *See id.* In this case,

30

for example, a Company-level remedy would require that any defendant held jointly and severally liable pay the full $63.54 million to the Company (using that figure for illustration only). An investor-level remedy would equate to $63,540 per share. The plaintiffs currently own 190 shares, so a liable defendant would have to pay $12.07 million. A smaller number makes settlement easier.

The Direct Claim Route also attends to the ebb and flow of the law in this area, where *El Paso* and *Morris* seem to favor direct challenges to mergers that extinguish derivative standing over the continuing litigation of derivative claims as such. Of course, there still will be cases when applying one of the exceptions to the continuous ownership rule makes sense, but those cases appear decidedly rare. *See Bamford v. Penfold, L.P.*, 2020 WL 967942, at *29 (Del. Ch. Feb. 28, 2020); *Schreiber*, 447 A.2d at 22 (Del. Ch. 1982); *Helfand v. Gambee*, 136 A.2d 558, 562 (Del. Ch. 1957).

The Direct Claim Route achieves these benefits without affecting the substantial rights of the parties. *See* Ct. Ch. R. 61. The plaintiffs have the ability to be made whole, and the defendants can continue to assert all of their procedural and substantive defenses. For purposes of the defendants' motions to dismiss based on *forum non conveniens*, for lack of personal jurisdiction, and for failure to state a claim on which relief can be granted, the court already would be analyzing their arguments as applied to direct claims because of the direct challenge to the Outbound Merger. The Direct Claim Route avoids the need to analyze those same arguments a second time as applied to derivative claims. In essence, option for the Direct Claim Route gives the defendants a win on the pre-Outbound Merger derivative claims.

31

If the Outbound Merger had cashed out the plaintiffs such that they had no continuing interest in the Company, then there would be no choice to make. The case would proceed along the Direct Claim Route. Because the Outbound Merger was a stock-for-stock merger and exceptions to the continuous ownership rule could apply, there is a choice to make. The course for this action that best promotes the goal of a just and (relatively) speedy and inexpensive disposition of this proceeding is to proceed along the Direct Claim Route.

Notably, although only Petigrow and Schwager have made this motion, the court's decision necessarily applies to the derivative claims as a whole. It would be counterproductive and excessively complex to litigate along the Derivative Claim Route for those defendants who did not join in the standing argument, while litigating along the Direct Claim Route for Petigrow and Schwager.

## D.    The Litigation Over Claims Based On Post-Merger Conduct Is Stayed.

The plaintiffs have asserted claims based on post-merger conduct. The plaintiffs contend that at least one of their post-merger theories states a direct claim. The theories generally present derivative claims.

If the court were to follow the Derivative Claim Route, then the plaintiffs could continue to litigate their derivative claims as if the Outbound Merger had not taken place. That ruling would apply equally to the derivative claims based on post-merger conduct. The merger would not affect direct claims based on post-merger conduct, other than to raise an issue as to choice of law.

32

The Direct Claim Route again simplifies matters. If the plaintiffs prevail and receive a quasi-appraisal award equal to the value of their shares on the effective date of the Outbound Merger (plus interest), then that remedy will provide full relief. The award will include a pro rata share of the value of the Company's operating business (perhaps $297,000 per share) plus a pro rata share of the derivative claims (perhaps $63,000 per share). As a condition to receiving that value, the court would require the plaintiffs to tender their shares to the Company, as if they had sought appraisal. *See* 8 *Del. C.* §§ 262(g), (l). The plaintiffs would no longer be stockholders of the Company as of the effective time, and they would not have any basis to assert post-merger claims.

Litigating the post-merger claims now risks wasting judicial and party resources on claims that may never need to be litigated. "This Court possesses the inherent power to manage its own docket, including the power to stay litigation on the basis of comity, efficiency, or simple common sense." *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 397 (Del. Ch. 2009). "Granting a stay is a discretionary enterprise and derives from a court's inherent power to control its docket." *Lima USA, Inc. v. Mahfouz*, 2021 WL 5774394, at *7 (Del. Super. Ct. Aug. 31, 2021) (citing *Solow v. Aspect Res., LLC*, 46 A.3d 1074, 1075 (Del. 2012)).

In this case, it makes sense to stay the claims that address post-merger conduct. If the plaintiffs prevail on their challenge to the Outbound Merger, then it never will be necessary to address those issues. By contrast, litigating the post-merger conduct will open up additional areas of discovery, and it will force the parties and the court to address a series of legal issues, including questions about choice of law. Because of the strength of

33

the plaintiffs' challenges to the Outbound Merger, the effort expended on those issues would likely go for naught.

Of course, it is possible that the plaintiffs may not prevail on their direct challenges to the Outbound Merger, at which point it would become necessary to address the post-merger claims. By that time, the plaintiffs may well have more issues to complain about. Mary Ellen and the Advisors continue to control the Company, and the plaintiffs appear to disagree strongly with the approach that Mary Ellen and the Advisors take to Company affairs. If it becomes necessary to litigate post-merger claims, then the parties should present all of the post-merger claims that they have as of that point.

Litigation over post-merger claims is stayed pending resolution of the claims challenging the Outbound Merger. The stay does not affect the claims challenging the transaction involving Mary Ellen's GRAT, which were not at issue on the current motion.

## III. CONCLUSION

Counts I, III, and IV assert both derivative and direct claims. The plaintiffs lack standing to litigate derivative claims based on pre-merger conduct. The plaintiffs may continue to pursue those issues along the Direct Claim Route. Litigation over post-merger conduct is stayed pending resolution of the claims challenging the Outbound Merger.